STATE OF WASHINGTON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 16153–79B.     Filed September 24, 1981.

*C. Willis Ritter* and *Walter D. Haynes,* for the petitioner. *Charles W. Rumph* and *Elizabeth D. DePriest,* for the respondent.

OPINION

TANNENWALD, *Chief Judge:* This is an action for a declaratory judgment pursuant to section 7478.[1] On March 1, 1979, petitioner submitted a ruling request to respondent following the procedures set forth in Rev. Proc. 79–4, 1979–1 C.B. 483.

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect.

Petitioner requested respondent to rule that the general obligation refunding bonds it proposed to issue are not "arbitrage bonds" within the meaning of section 103(c) and that the interest paid by petitioner to the holders of such bonds would be exempt from Federal income tax pursuant to section 103(a). After a lengthy administrative review, respondent denied petitioner's request.

All of the jurisdictional requirements for a declaratory judgment have been satisfied. See Rule 210(c), Tax Court Rules of Practice and Procedure. The burden of proof is upon petitioner. See Rule 217(c)(2)(i), Tax Court Rules of Practice and Procedure. Our decision is based upon the administrative record. See Rule 217(a), Tax Court Rules of Practice and Procedure. For the reasons set forth below, we hold for petitioner.

On April 21, 1971, petitioner issued its public school building revenue bonds, series C (the outstanding bonds) to finance the construction of public schools. The outstanding bonds bear interest rates ranging from 8 percent to 6 percent payable semiannually on May 1 and November 1 and mature annually on May 1 of each year through 2001. On the date of petitioner's ruling request, there were $19,880,000 outstanding bonds as follows:

DEBT SERVICE SCHEDULE
WITH RESPECT TO OUTSTANDING BONDS

| Year ending May 1— | Principal | Coupon | Interest | Total debt service |
|---|---|---|---|---|
| 1980 | $430,000 | 8.0000 | $1,252,115 | $1,682,115 |
| 1981 | 460,000 | 8.0000 | 1,217,715 | 1,677,715 |
| 1982 | 490,000 | 6.0000 | 1,180,915 | 1,670,915 |
| 1983 | 520,000 | 6.0000 | 1,151,515 | 1,671,515 |
| 1984 | 555,000 | 6.0000 | 1,120,315 | 1,675,315 |
| 1985 | 590,000 | 6.0000 | 1,087,015 | 1,677,015 |
| 1986 | 630,000 | 6.0000 | 1,051,615 | 1,681,615 |
| 1987 | 670,000 | 6.0000 | 1,013,815 | 1,683,815 |
| 1988 | 715,000 | 6.1000 | 973,615 | 1,688,615 |
| 1989 | 760,000 | 6.2000 | 930,000 | 1,690,000 |
| 1990 | 810,000 | 6.2500 | 882,880 | 1,692,880 |
| 1991 | 860,000 | 6.2500 | 832,255 | 1,692,255 |

| | | | | |
|---|---|---|---|---|
| 1992 | $920,000 | 6.3000 | $778,505 | $1,698,505 |
| 1993 | 975,000 | 6.3000 | 720,545 | 1,695,545 |
| 1994 | 1,040,000 | 6.4000 | 659,120 | 1,699,120 |
| 1995 | 1,110,000 | 6.4000 | 592,560 | 1,702,560 |
| 1996 | 1,180,000 | 6.4000 | 521,520 | 1,701,520 |
| 1997 | 1,260,000 | 6.4000 | 446,000 | 1,706,000 |
| 1998 | 1,340,000 | 6.4000 | 365,360 | 1,705,360 |
| 1999 | 1,425,000 | 6.4000 | 279,600 | 1,704,600 |
| 2000 | 1,520,000 | 6.0000 | 188,400 | 1,708,400 |
| 2001 | 1,620,000 | 6.0000 | 97,200 | 1,717,200 |
| Totals | 19,880,000 | | 17,342,580 | 37,222,580 |

The outstanding bonds maturing on or after May 1, 1987, may be called for redemption by petitioner without penalty on November 1, 1986. On that date, there will be $16,205,000 in outstanding bonds. On the date of petitioner's ruling request, the semiannual debt service on the $19,880,000 outstanding bonds through and including the redemption of the $16,205,000 in bonds remaining on November 1, 1986, was as follows:

DEBT SERVICE REQUIREMENTS
ON OUTSTANDING BONDS THROUGH REDEMPTION

| Date (first day of) | Principal | Interest | Total |
|---|---|---|---|
| Nov. 1979 | 0 | $626,057.50 | $626,057.50 |
| May 1980 | $430,000 | 626,057.50 | 1,056,057.50 |
| Nov. 1980 | 0 | 608,857.50 | 608,857.50 |
| May 1981 | 460,000 | 608,857.50 | 1,068,857.50 |
| Nov. 1981 | 0 | 590,457.50 | 590,457.50 |
| May 1982 | 490,000 | 590,457.50 | 1,080,457.50 |
| Nov. 1982 | 0 | 575,757.50 | 575,757.50 |
| May 1983 | 520,000 | 575,757.50 | 1,095,757.50 |
| Nov. 1983 | 0 | 560,157.50 | 560,157.50 |
| May 1984 | 555,000 | 560,157.50 | 1,115,157.50 |
| Nov. 1984 | 0 | 543,507.50 | 543,507.50 |
| May 1985 | 590,000 | 543,507.50 | 1,133,507.50 |
| Nov. 1985 | 0 | 525,807.50 | 525,807.50 |

| | | | |
|---|---|---|---|
| May 1986 | $630,000 | $525,807.50 | $1,155,807.50 |
| Nov. 1986 | 16,205,000 | 506,907.50 | 16,711,907.50 |
| Totals | 19,880,000 | 8,568,112.50 | 28,448,112.50 |

The outstanding bonds are limited obligations of the State of Washington, payable only from specifically identified revenues of certain trust funds pledged therefor. Because the outstanding bonds are not general obligations of the State, their credit rating is lower and their interest rates are higher than they would be were they issued as general obligation bonds. In addition, the State is required to fund and maintain a reserve account for the outstanding bonds in an amount equal to at least 2 times the maximum amount of principal and interest payable on the outstanding bonds in any year. A total of approximately $5 million has been accumulated in the reserve account and other accounts for eventual payment of debt service on the outstanding bonds. Section 10 of the 1971 resolution of the State authorizing the issuance of the outstanding bonds provides that if money and direct obligations of the United States sufficient to redeem the outstanding bonds are irrevocably set aside in a principal and interest account for the outstanding bonds, then the lien of the outstanding bonds against the funds and revenues pledged to the payment of the outstanding bonds shall be released.

Following issuance of the outstanding bonds, the State of Washington constitution was amended to authorize the State to pledge its full faith, credit, and taxing power to the payment of debt service on new bonds which otherwise would be payable only from the limited revenues pledged to the outstanding bonds. Because of the higher credit rating assigned to bonds backed by the full faith and credit of the State, petitioner expects that bonds issued to refund the outstanding bonds will bear lower interest rates than the outstanding bonds. Furthermore, since general obligation bonds of the State need not be secured by reserve accounts, the State can apply the $5 million of funds accumulated for the outstanding bonds to reduce the principal amount of refunding bonds required to refund the outstanding bonds. Petitioner therefore intends to issue approximately $15,160,000 general obligation bonds in order to refund the limited obligation outstanding bonds.

Pursuant to authority vested in it, the State of Washington finance committee on December 5, 1978, adopted a resolution authorizing the issuance of "State of Washington General Obligation Refunding Bonds, Series D" (the refunding bonds) in the principal amount of $15,200,000, or such greater or lesser amount as may be required to comply with the requirements of section 103(c). In its ruling request, petitioner anticipated that the actual amount of bonds sold would be $15,160,000.

The refunding bonds will be sold by petitioner at public sale pursuant to the official notice of bond sale which requests that sealed bids be submitted to petitioner. Refunding bonds will be awarded to the bidder whose offer, taking into account both the coupon rate and the price to be received by petitioner, represents the lowest net cost to petitioner. The purchaser will acquire ownership of the refunding bonds for its own account and not as a broker or agent for petitioner. Petitioner anticipates that the refunding bonds will be sold to the lowest bidder at 98.5 percent of par. However, petitioner also anticipates that the refunding bonds will be resold to the public at 100 percent of par, although the purchaser of the refunding bonds will not be obligated to resell them. Petitioner has often sold bonds in this manner.

The proposed refunding bonds will bear coupon rates ranging from 4¾ percent to 5⅝ percent. With these coupon rates and a purchase price of 98.5 percent of par, the principal amount of refunding bonds actually awarded to the lowest bidder would be $15,160,000. The debt service on such refunding bonds as compared to the debt service on the outstanding bonds absent the refunding (and therefore absent early redemption) is as follows:

| Year ending May 1— | Refunding bonds | | | | Outstanding bonds | |
| | Principal | Coupon | Interest | Total debt service | debt service [1] | Reduction |
| --- | --- | --- | --- | --- | --- | --- |
| 1980 | $580,000 | 4.7500 | [2]$688,952 | $1,268,952 | $1,682,115 | $413,163 |
| 1981 | 385,000 | 4.8500 | 799,192 | 1,184,192 | 1,677,715 | 493,522 |
| 1982 | 395,000 | 4.9500 | 780,520 | 1,175,520 | 1,670,915 | 495,395 |
| 1983 | 415,000 | 5.0500 | 760,967 | 1,175,967 | 1,671,515 | 495,547 |
| 1984 | 440,000 | 5.1500 | 740,010 | 1,180,010 | 1,675,315 | 495,305 |
| 1985 | 465,000 | 5.2000 | 717,350 | 1,182,350 | 1,677,015 | 494,665 |
| 1986 | 495,000 | 5.2500 | 693,170 | 1,188,170 | 1,681,615 | 493,445 |
| 1987 | 525,000 | 5.3000 | 667,182 | 1,192,182 | 1,683,815 | 491,632 |
| 1988 | 555,000 | 5.3500 | 639,357 | 1,194,357 | 1,688,615 | 494,257 |
| 1989 | 585,000 | 5.4000 | 609,665 | 1,194,665 | 1,690,000 | 495,335 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1990 | $620,000 | 5.4500 | $578,075 | $1,198,075 | $1,692,880 | $494,805 |
| 1991 | 655,000 | 5.5000 | 544,285 | 1,199,285 | 1,692,255 | 492,970 |
| 1992 | 695,000 | 5.5500 | 508,260 | 1,203;260 | 1,698,505 | 495,245 |
| 1993 | 735,000 | 5.6250 | 469,687 | 1,204,687 | 1,695,545 | 490,857 |
| 1994 | 780,000 | 5.6250 | 428,344 | 1,208,344 | 1,699,120 | 490,776 |
| 1995 | 825,000 | 5.6250 | 384,469 | 1,209,469 | 1,702,560 | 493,091 |
| 1996 | 870,000 | 5.6250 | 338,062 | 1,208,062 | 1,701,520 | 493,457 |
| 1997 | 925,000 | 5.6250 | 289,125 | 1,214,125 | 1,706,000 | 491,875 |
| 1998 | 975,000 | 5.6250 | 237,094 | 1,212,094 | 1,705,360 | 493,266 |
| 1999 | 1,030,000 | 5.6250 | 182,250 | 1,212,250 | 1,704,600 | 492,350 |
| 2000 | 1,090,000 | 5.6250 | 124,312 | 1,214,312 | 1,708,400 | 494,087 |
| 2001 | 1,120,000 | | 63,000 | 1,183,000 | 1,717,200 | 534,200 |
| Totals[3] | 15,160,000 | | 11,243,331 | 26,403,331 | 37,222,580 | 10,819,249 |

[1] This column is the same as the "Total debt service" column set forth in the schedule on pp. 657–658 *supra.*

[2] Excludes accrued interest from the anticipated date of the refunding bonds (May 1, 1979) to the anticipated closing date (July 1, 1979) paid by the purchaser of the bonds at closing in the amount of $137,790.42.

[3] All figures have been rounded.

Petitioner will pay approximately $40,000 for issuance expenses, including attorneys' fees, preparation and distribution of an official statement describing the refunding bonds, and printing and delivery of the refunding bonds.

In order to pay the debt service on the outstanding bonds through and including their redemption on November 1, 1986, substantially all of the proceeds available to petitioner from the sale of the refunding bonds, together with the $5 million in funds accumulated for the outstanding bonds reserve account, will be invested in direct obligations of the United States. Petitioner will receive and disburse these funds in the following manner:

*Receipts*

| | |
|---|---|
| $15,160,000 of refunding bonds awarded at bid of 98.5 percent of par | $14,932,600.00 |
| Accrued interest on first coupon to closing date paid by purchaser | 137,790.42 |
| Less issuance expenses | 40,000.00 |
| | 15,030,390.42 |

*Disbursements*

| | |
|---|---:|
| Deposit accrued interest received to be applied toward payment of first coupon on refunding bonds............................ | $137,790.42 |
| Purchase U.S. Treasury obligations......................... | 14,890,900.00 |
| Deposit balance to pay debt service on refunding bonds................................ | 1,700.00 |
| | 15,030,390.42 |

Petitioner will invest the amount of $14,890,900 available from the refunding bonds in U.S. Treasury certificates of indebtedness and notes—State and local government series, payable as follows:

INVESTMENT OF BOND PROCEEDS[1]

| Date | Principal received | Coupon rate | Interest received | Total available |
|---|---:|---:|---:|---:|
| Nov. 1979 | $147,900 | 5.7550 | $278,307 | $426,207 |
| May 1980 | 423,700 | 5.7550 | 432,413 | 856,113 |
| Nov. 1980 | 0 | 5.7550 | 412,038 | 412,038 |
| May 1981 | 453,600 | 5.7550 | 412,038 | 865,638 |
| Nov. 1981 | 0 | 5.7550 | 398,986 | 398,986 |
| May 1982 | 472,900 | 5.7550 | 398,986 | 871,886 |
| Nov. 1982 | 0 | 5.7550 | 385,378 | 385,378 |
| May 1983 | 500,800 | 5.7550 | 385,378 | 886,178 |
| Nov. 1983 | 0 | 5.7550 | 370,967 | 370,967 |
| May 1984 | 533,400 | 5.7550 | 370,967 | 904,367 |
| Nov. 1984 | 0 | 5.7550 | 355,619 | 355,619 |
| May 1985 | 565,800 | 5.7550 | 355,619 | 921,419 |
| Nov. 1985 | 0 | 5.7550 | 339,338 | 339,338 |
| May 1986 | 602,900 | 5.7550 | 339,338 | 942,238 |
| Nov. 1986 | 11,189,900 | 5.7550 | 321,989 | 11,511,889 |
| Totals | 14,890,900 | | 5,557,359 | 20,448,261 |

---

[1] All figures are rounded.

In addition, petitioner will invest the $5 million accumulated reserve account funds in open-market direct obligations of the United States maturing August 15, 1986, with interest of $200,000 payable each February and August from August of 1979 through August of 1986. Accordingly, the cash flow from the invested funds will be sufficient to pay the debt service on the outstanding bonds as seen in the following table.

APPLICATION OF TOTAL CASH FLOW FROM INVESTMENTS [1]

| Payment date | Starting balance | From refunding bond proceeds | From non-bond proceeds | Total available | Outstanding bonds' total requirement | Closing balance |
|---|---|---|---|---|---|---|
| Nov. 1979 | 0 | $426,207 | $200,000 | $626,207 | $626,057 | $149 |
| May 1980 | $149 | 856,113 | 200,000 | 1,056,113 | 1,056,057 | 205 |
| Nov. 1980 | 205 | 412,038 | 200,000 | 612,038 | 608,857 | 3,385 |
| May 1981 | 3,385 | 865,638 | 200,000 | 1,065,638 | 1,068,857 | 166 |
| Nov. 1981 | 166 | 398,986 | 200,000 | 598,986 | 590,457 | 8,694 |
| May 1982 | 8,694 | 871,886 | 200,000 | 1,071,886 | 1,080,457 | 122 |
| Nov. 1982 | 122 | 385,378 | 200,000 | 585,378 | 575,757 | 9,742 |
| May 1983 | 9,742 | 886,178 | 200,000 | 1,086,178 | 1,095,757 | 162 |
| Nov. 1983 | 162 | 370,967 | 200,000 | 570,967 | 560,157 | 10,972 |
| May 1984 | 10,972 | 904,367 | 200,000 | 1,104,367 | 1,115,157 | 182 |
| Nov. 1984 | 182 | 355,619 | 200,000 | 555,619 | 543,507 | 12,293 |
| May 1985 | 12,293 | 921,419 | 200,000 | 1,121,419 | 1,133,507 | 204 |
| Nov. 1985 | 204 | 339,338 | 200,000 | 539,338 | 525,807 | 13,735 |
| May 1986 | 13,735 | 942,238 | 200,000 | 1,142,238 | 1,155,807 | 165 |
| Nov. 1986 | 165 | 11,511,889 | 5,200,000 | 16,711,889 | 16,711,907 | 147 |
| Totals | 0 | [2] 20,448,259 | [3] 8,000,000 | 28,448,259 | [4] 28,448,112 | 147 |

[1] All figures have been rounded.
[2] See p. 662 *supra.*
[3] The 5 million principal plus the anticipated cumulative annual interest. See p. 662 *supra.*
[4] See p. 659 *supra.*

Interest received by a taxpayer on an obligation of a State or municipality is, as a general rule, exempt from Federal income tax. Sec. 103(a). This exemption has been an enduring feature of the Federal income tax. Compare section 103(a) with section II(B) of the Revenue Act of 1913, Pub. L. 63–16, 38 Stat. 168. Its recognized purpose has been to aid State and local governments by allowing them to issue marketable bonds at interest rates below those of corporate and Federal securities. See, e.g., 113 Cong. Rec. 31,611 (daily ed. Nov. 8, 1967) (statement of Senator Ribicoff). However, by the mid-sixties, it became apparent that this exemption had provided opportunities for abuse and, as a consequence, Congress enacted section 103(b) (dealing with industrial development bonds) and section 103(c) (dealing with arbitrage bonds) limiting the eligibility for exemption under section 103(a) of certain bonds in each of those categories. It is the provisions of section 103(c) dealing with arbitrage bonds with which this case is concerned. The pertinent section is 103(c)(2), which reads in part:

the term "arbitrage bond" means any obligation which is issued as part of an issue all or a major portion of the proceeds of which are reasonably expected to be used directly or indirectly—

(A) to acquire securities * * * or obligations * * * which may· be reasonably expected at the time of issuance of such issue, to produce a yield over the term of the· issue which is materially higher (taking into account any discount or premium) than the yield on obligations of such issue * * *

Petitioner will invest the proceeds from the refunding bonds until the outstanding bonds can be redeemed. These proceeds will be invested in obligations of the U.S. Government, and in order to avoid the taint of arbitrage, petitioner must restrict its choice of investment securities to those producing a "yield" no greater than that on the refunding bonds.[2] A precise meaning to the word "yield" is thus essential to the determination which we must make.

If a bond is issued at par and pays a fixed annual return, then the "yield" is simply the rate of interest which it pays. If a bond is issued at a discount or premium, however, or if its coupon rates vary, then the "yield" must be computed according to a mathematical formula which expresses the bond's overall return (including original issue discount or premium) in the form of simple annual interest. This formula is a function of certain parameters including the bond's original purchase price, its redemption (i.e., retirement) price, and its coupon rates.[3] While the parties herein agree upon the mathematical manipulations necessary to compute the correct "yield" on the refunding bonds,[4] they disagree as to the value

---

[2]In fact, respondent's regulations permit an issuer to invest such proceeds in securities that produce a yield slightly higher than the yield on the bonds issued. The formula for determining this amount is not an issue in this case. See sec. 1.103–13(b)(5)(iii)(A), Income Tax Regs.

[3]If "yield" is thought of as that percentage of the purchase price which, were it to be paid ratably and assuming that the bond were to be issued and retired at par, would have a present value equal to the present value of the sum of the coupon payments plus the original issue discount or premium (if any), then the computation of "yield" also depends upon the assumed annual discount factor. See generally A. Alchian & W. Allen, University Economics 205–209 (2d ed. 1967), reprinted in M. Chirelstein, Federal Income Taxation 331–336 (2d ed. 1979).

[4]Respondent's regulations provide that "the term 'yield' means that yield which when used in computing the present worth of all payments of principal and interest to be paid on the obligation produces an amount equal to the purchase price." Sec. 1.103–13(c)(1)(ii), Income Tax Regs. Petitioner has accepted this definition, though with the understanding (necessary to avoid circularity) that the second use of "yield" should be replaced with "annual discount factor" or some similar phrase.

to be assigned to one of the underlying parameters, namely, the purchase price.

Petitioner asserts that the "purchase price" of the refunding bonds should be taken as the amount of money actually received by petitioner less administrative costs necessarily incurred in issuing the bonds; that is, 98.5 percent of $15,160,000 less $40,000, or $14,892,000. Respondent, on the other hand, asserts that the "purchase price" should be the full $15,160,000 which the public is expected to pay for the refunding bonds, and thus would treat both the underwriter's spread and the administrative expenses as amounts received and retained by petitioner. To support his position, respondent relies on his regulation which provides that "the term 'purchase price' means the initial offering price to the public (excluding bond houses, brokers, and other intermediaries)." Sec. 1.103–13(d)(2), Income Tax Regs. In addition, administrative expenses such as those at issue herein are expressly forbidden to be taken into account in computing the "purchase price." Sec. 1.103–13(d)(1), Income Tax Regs.[5]

Petitioner concedes that its anticipated sale of the refunding bonds for 98.5 percent of par will be made to a bond house, broker, or other intermediary within the meaning of section 1.103–13(d)(2), Income Tax Regs. It contends, however, that respondent's regulation defining "purchase price" is invalid. For the reasons hereinafter set forth, we agree with petitioner.

At the outset, it is important to note that petitioner will not, in terms of actual dollars and cents, make a profit from the spread between the nonprincipal payments on the refunding bonds and the yield on the bonds in which the proceeds of the refunding bonds are to be invested.[6] Indeed, petitioner will not even recover all of its actual issuing expenses, because to do so would require that the proceeds from the refunding bonds not

---

[5] The parties have not furnished us with the difference in yields which would exist if respondent is sustained, but petitioner does not contend that the bonds in question would be eligible under such circumstances and it seems clear that they would not be, since petitioner has already taken advantage, in its calculation, of the difference in yield permitted by respondent's regulations. See note 2 *supra*.

[6] To the extent that there is a profit flowing from the ability to earn an amount which is not "materially higher" than the yield on the refunding bonds, as permitted by sec. 1.103–13(b)(5)(iii)(A), Income Tax Regs., it properly can be ignored and respondent has not argued otherwise.

be used to refund the outstanding bonds, but instead be used solely to purchase investment securities which would be held for the entire period during which the refunding bonds were outstanding.[7]

Respondent's argument to support the validity of his regulation rests upon three prongs: (1) The language of section 103(c)(2) unambiguously supports his position; (2) the legislative history of section 103(c) justifies his interpretations of "yield" vis-a-vis "purchase price" and; (3) the reasonableness of his regulation becomes apparent in the light of his experience in administering section 103(c). He buttresses these prongs by referring to the felicitous attitude which the Courts generally take toward his regulations, particularly in light of the specific legislative authority to promulgate regulations.[8]

We think that our disposition of respondent's arguments will be facilitated by first considering the circumstances surrounding the enactment of section 103(c). Respondent first addressed the problem to which that section is directed when he announced in T.I.R. 840 (August 11, 1966), Stand. Fed. Tax Rep. par. 6701 (CCH 1966), that he would *decline* to issue rulings whether certain municipal or State bonds qualified under section 103(a). These municipal or State bonds were ones—

issued by * * * governmental units where a principal purpose is to invest the proceeds of the tax-exempt obligations in taxable obligations, generally United States Government securities, bearing a higher interest yield. The *profit* received by the governmental units on the difference between the interest paid on the exempt obligations and the interest earned on the taxable obligations is in the nature of arbitrage. [Emphasis added.]

Shortly after respondent's announcement, a bill was introduced into the House of Representatives which would have removed arbitrage bonds from the exemption provided by section 103. See H.R. 11757, 90th Cong., 1st Sess. (1967). When

---

[7]While it is true that petitioner's method of computing "yield" allows it to recapture its actual issuing expenses by investing the proceeds from the refunding bonds in securities paying a higher return than respondent would allow, such recapture is obtained ratably over the term of the refunding bonds. Thus, since the proceeds from the refunding bonds will not be invested for the full term of their issue, a proportionate part of the issuing expenses will not be recaptured but rather will be borne, nominally *and* in fact, by petitioner.

[8]Sec. 103(c)(6) specifically provides that "The Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this subsection."

the bill was introduced, its author made the following statement:

> The mechanics of an arbitrage bond are simple. A State or local government issues bonds and agrees to invest the proceeds in Federal bonds which are then placed in escrow for the payment of interest and principal on the State or local bonds. The investor in these bonds has a certificate which represents neither more nor less than an interest in Federal bonds, but because the interest payments made by the Federal Government pass through the hands of the State or local government it is argued that the interest is exempt. The local government thus *makes a profit* from the interest differential that exists between the taxable Federal securities and the nontaxable securities which it purports to issue.
>
> \* \* \* Arbitrage bonds really represent an agreement by the issuer to act as a conduit or trustee for passing interest on Federal bonds to private persons and they are not "obligations" of a State or local government within the meaning of existing law. [113 Cong. Rec. 20,033 (daily ed. July 25, 1967) (statement of Representative John Byrnes). Emphasis added.]

Comparable legislation (S. 2636, 90th Cong., 1st Sess. (1967)) dealing with both industrial development bonds[9] and arbitrage bonds was subsequently introduced in the Senate. As to the latter, the author of the bill stated:

> In addition to industrial development bonds, another abuse of the tax exemption afforded State and local bonds has gained prominence within the last few years; I am referring to the so-called arbitrage bonds where a local government invests the proceeds of its tax-exempt issue in U.S. bonds which in turn secure the bonds issued. In effect the investor has a certificate evidencing an interest in Federal bonds, but the suggestion is made that the interest received is exempt because the funds pass through the hands of a local government unit.
>
> The local government *seeks to make a profit* from the difference in interest rates that would arise, since interest on Federal bonds is taxable and the interest paid by the local government is claimed to be exempt. And *this profit* is claimed on the sole ground that the local government lends its name to a security—without assuming any risk, or responsibility, or work, or anything else. [113 Cong. Rec. 31,613 (statement of Senator Abraham Ribicoff). Emphasis added.]

The emphasis on "profit" was reiterated by the Treasury Department which stated that:

an obligation be considered an "arbitrage obligation" if \* \* \* the circumstances \* \* \* demonstrate that the result of the issuance is the realization of

---

[9]Provisions relating to these bonds were subsequently enacted as sec. 103(b). See generally *Fairfax County Economic Development Authority v. Commissioner*, 77 T.C. 546 (1981).

an arbitrage *profit* from reinvestment of the proceeds [of tax-exempt bonds] in higher yield securities * * * [Senate Comm. on Finance, 91st Cong., 1st Sess., Technical Memorandum of Treasury Position 118 (Comm. Print 1969). Emphasis added.]

The Senate Finance Committee similarly perceived the role of the legislation as ensuring that the Federal Government does not "[become] an unintended source of revenue for State and local governments." S. Rept. 91–552, at 219 (1969); see also H. Rept. 91–413 (Part 1), at 173 (1969).

One further element of legislative history requires attention because it has a direct bearing on our resolution of the basic issue herein, to wit, the validity of respondent's regulation. As originally passed by the House of Representatives, section 103(c) would have provided without elaboration that "Under regulations prescribed by the Secretary or his delegate, any arbitrage obligation shall be treated as an obligation not described in subsection (a)(1)" of Code section 103. H.R. 13270, 91st Cong., 1st Sess. sec. 601(b), at 318 (1969). However, the Treasury Department explicitly requested Congress to provide "a clearer standard." Comm. on Finance, 91st Cong., 1st Sess., Technical Memorandum of Treasury Position, *supra*. The Senate Finance Committee acceded to the Treasury's request by recommending a change in the proposed legislation so that "arbitrage bonds are defined." S. Rept. 91–552, *supra* at 219. That change became law and is now embodied in section 103(c). See H. Rept. 91–782 (Conf.), at 324 (1969).

As finally enacted, section 103(c) did not specifically adopt the "conduit" frame of reference reflected in the thinking of its original sponsors, i.e., the use of refunding issues, secured only by obligations of the United States. See pp. 666–667 *supra*. Rather, it dealt with the problem of arbitrage bonds in terms of comparison of "yield" and thereby directed the thrust of the section to the *main concern* of its sponsors, namely, the curtailment of arbitrage profits. See pp. 666–667 *supra*.

There is no indication in the legislative history of why Congress did not confine section 103(c) within a "conduit" frame of reference. It is entirely possible that Congress, recognizing that its primary objective should be to eliminate the "profit" element which permeated the use of arbitrage bonds, did not want to dilute the accomplishment of that objective by excluding bonds not so secured, even though the

potential for "profit" was present, to say nothing of the qualifications and exemptions which might have had to have been engrafted on the statute.[10] In this context, the anti-"profit" purpose of Congress in enacting section 103(c) becomes even more significant. In short, as finally enacted, section 103(c) was designed to deal only with the legislative concern that arbitrage profits should be eliminated.

It is against the foregoing background that we turn to an analysis of respondent's arguments.

As to the statute itself, we think that the language used in section 103(c)(2) is far from clear. In literal terms, it seems to require a comparison between what the holder will receive from petitioner with what petitioner will receive from its investment. That comparison, of course, will measure petitioner's actual profit only as long as all the expenses incurred by petitioner are paid to the holders of the bonds. Yet, when (as here) some of petitioner's expenses must be paid to persons who may not be ultimate holders of the refunding bonds, the comparison mandated by section 103(c)(2) mixes apples and pears and makes no sense. The equivalence between petitioner's cost and the "yield" on the refunding bonds only exists where the sole element of cost is the discount on issuance, an element which we long ago denominated as interest. See *United States Playing Card Co. v. Commissioner*, 15 B.T.A. 975 (1929). But where there are other elements of cost, or where (as in the case herein) the "yield" to the holder depends upon who the holder is, such equivalence often will not exist. Indeed, by "excluding bond houses, brokers and other intermediaries," as his regulation does (see sec. 1.103–13(d)(2), Income Tax Regs.), respondent accentuates the difference between "yield" and the issuer's cost and, in our opinion, expands the net of section 103(c)(2) to encompass a formula for determining profits which sweeps in a fictitious element of profit and goes beyond what is necessary to achieve the legislative purpose of the statutory provision.

Moreover, the statutory language, which respondent claims is so unambiguous, is clouded by further language in section

---

[10]Qualifications and exemptions were found to be essential at the time of the prior enactment of sec. 103(b), dealing with industrial development bonds, in which a modified conduit frame of reference was adopted. See *Fairfax County Economic Development Authority v. Commissioner, supra.*

103(c), itself. Section 103(c)(2)(A) (see p. 664 *supra*) mandates that "*any* discount or premium" (emphasis added) be taken into account in computing "yield," and we are satisfied that this qualification attaches to the "yield" on the obligations issued as well as to the "yield" on the obligations in which the proceeds of the issue are invested.

A still further indication that the language of section 103(c)(2) does not mean what it seems literally to say stems from the fact that when Congress has desired to exclude bond houses and brokers and look only to the public offering price, it has done so in explicit terms. See section 1232(b)(1) dealing with original issue discount, as originally enacted in the Internal Revenue Code of 1954, which defined the term "issue price" to mean "the initial offering price to the public (excluding bond houses and brokers)." The subsequent failure of Congress to incorporate such qualifying language in section 103(c)(2)(A) strongly suggests that Congress intended the "discount" and therefore the "yield" referred to in section 103(c)(2)(A) to be more broadly construed. Cf. *Brewster v. Gage*, 280 U.S. 327, 337 (1930).

The lack of certainty as to the meaning of section 103(c)(2)(A), as far as the instant case is concerned, is further reflected in respondent's own handling of the question of "profit." Respondent's earliest view of section 103(c) was articulated in section 13.4, Temporary Income Tax Regs., 26 C.F.R. sec. 13.4, 35 Fed. Reg. 17407 (1970), in which he determined that "an amount equal to the sum of the reasonably expected administrative costs of issuing, carrying, and repaying [an] issue of obligations shall be treated as a discount on the selling price of such issue" for computing "yield." This interpretation was consistently enforced for the 6 years following temporary regulations section 13.4, see section 1.103–13(c)(3)(i)(*a*), Proposed Income Tax Regs., 37 Fed. Reg. 10950 (1972); section 1.103–13(c)(1), Proposed Income Tax Regs., 38 Fed. Reg. 10947 (1973), and it was not fully[11]

---

[11]In sec. 1.103–13(c)(1)(ii), Proposed Income Tax Regs., 41 Fed. Reg. 47683 (1976), respondent limited fees paid for services of "a fiscal agent or financial consultant" to specified percentages of the face value of the bonds, and provided that "any amounts taken into account under the preceding sentence may not represent amounts designed to divert arbitrage to the recipient."

repudiated until the middle of 1978. See sec. 1.103–13(c)(5), Proposed Income Tax Regs., 43 Fed. Reg. 19677 (1978). By allowing issuers to treat administrative expenses as discount, respondent implicitly recognized that section 103(c) seeks to eliminate, as arbitrage profits, the *net gain* to the issuer.[12]

Finally, respondent claims congressional support for his position in the Mortgage Subsidy Bond Tax Act of 1980, sec. 1101 et seq., Pub. L. 96–499, 94 Stat. 2660–2681. That act did not affect section 103 in a way directly relevant herein, but respondent argues that it demonstrates Congressional approval of his final administrative interpretation of section 103(c). We disagree.

The primary changes effected by the Mortgage Subsidy Bond Tax Act of 1980 are contained in section 103A which it created.[13] Section 103A exempts from section 103(c) bonds issued to provide mortgages on certain owner-occupied residences. However, section 103A(i) imposes *its own* arbitrage restrictions by limiting the yield on the home mortgages (which play the role of the investment securities) to 1 percent above that on the exempt bonds. Further, "yield" is defined for section 103A just as respondent interprets it in section 103(c). See sec. 103A(i)(2)(C).[14]

The fact of the matter, however, is that the cross-reference to section 1232(b)(2) in section 103A's definition of "yield"[15]

---

[12]We are not saying that respondent may never change his interpretation of a statute. See *National Muffler Dealers Assn. v. United States*, 440 U.S. 472, 485 (1979); *Helvering v. Wilshire Oil Co.*, 308 U.S. 90, 101 (1939). Rather, we merely are observing that the contemporaneous construction of a statute by the agency charged with its enforcement is strong evidence of the statute's purpose. See Williams, "Preparation and Promulgation of Treasury Department Regulations Under Internal Revenue Code of 1954," 1956 S. Cal. Tax Inst. 733, 741. This observation is particularly appropriate when, as here, the statute to be interpreted was enacted in response to a particular agency request for legislation curbing an articulated, narrow abuse. When a regulation repudiates the prior construction of a statute, "the manner in which it evolved merits inquiry." *National Muffler Dealers Assn. v. United States, supra* at 477; see also *Kurzner v. United States*, 413 F.2d 97, 112 (5th Cir. 1969).

[13]In addition, a modification was made in sec. 103(b)(4)(A), the relevance of which to the instant case is obscure at best.

[14]While respondent has not provided us with his computation of "yield" (see also note 5 *supra*), we note that the parties are disputing the proper treatment of $268,000 in discount and expenses. A change of 1 percent in the "yield" of the refunding bonds (from petitioner's proposed 5.7481 percent to 4.7481 percent) would reflect an increase in the "purchase price" of approximately $1,400,000, 5 times the amount in controversy herein.

[15]Sec. 103A(i)(2)(C), in pertinent part, reads as follows:

YIELD ON THE ISSUE.—For purposes of this subsection, the yield on the issue shall be

undermines respondent's contention and reenforces our view that, since Congress did not refer to section 1232(b)(2) in section 103(c)(2)(A), it intended "yield" in the latter section to be defined differently. See p. 670 *supra*. Moreover, we note that the 1 percent of arbitrage profit permitted by section 103A(i)(2) is substantially greater than the amount which respondent characterizes as arbitrage in the instant case, and thus it represents a liberalization of section 103(c) beyond even petitioner's interpretation. Assuming, as repondent contends, that our interpretation of section 103(c) should be guided by congressional actions subsequent to its enactment (compare *United Telecommunications, Inc. v. Commissioner*, 65 T.C. 278, 287 (1975), affd. 589 F.2d 1383 (10th Cir. 1978), with 65 T.C. at 294 (Wilbur, J., concurring)), we find that section 103A (intended to relax the arbitrage constraints as to specific obligations) is as consistent with petitioner's position in this case as with respondent's. Accordingly, we draw no inference either way from the Mortgage Subsidy Bond Tax Act of 1980.[16]

Our analysis leads us to the conclusion that the language of section 103(c)(2)(A) is not as clear as respondent would have us believe. Such being the case, we think that we should look to legislative purpose to arrive at an appropriate interpretation of the word "yield." See *J. C. Penney Co. v. Commissioner*, 37 T.C. 1013, 1017 & n. 4, affd. 312 F.2d 65 (2d Cir. 1962); Comment, 93 Harv. L. Rev. 430, 433 nn. 24 & 25 (1979). Having done so (see pp. 666–669), we are led to the conclusion that respondent's interpretation of section 103(c)(2)(A) is at odds with the legislative history and the totality of the circumstances surrounding the enactment of section 103(c) including respondent's initial interpretation. It is certainly true that advance refundings proliferated as State and local govern-

---

determined on the basis of—

(i) the issue price (within the meaning of section 1232(b)(2)), * * *

[16]We note also that sec. 337, Pub. L. 95–600, 92 Stat. 2842, prohibits the Treasury from retroactively enforcing its restrictive definition of "yield" with respect to certain bonds benefiting charities. See generally H. Rept. 95–1800 (Conf.), at 240–241 (1978), 1978–3 C.B. (Vol. 1) 574–575. This seems not so much a ratification of respondent's final regulations as a response to and partial relaxation of those regulations premised upon their assumed validity. In light of respondent's general authority to issue regulations (see sec. 7805), we think this congressional response reflects no more than an awareness that most regulations are valid and have the force and effect of the law. Cf. *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981), 47 AFTR 2d 81–1513, 81–1519 n. 13, 81–1 USTC par. 9427.

ments sought to issue bonds which would net them an arbitrage profit, and it is also true that Congress sought to curtail such issuances, but that was not because of any congressional terror of advance refunds per se, but because the advance refundings were used to generate arbitrage profits. To ignore petitioner's actual issuing costs, as respondent would have us do herein, is to produce a situation which would force local governments to lose money (see p. 665 *supra*), a result which we are satisfied goes beyond what Congress intended to do.[17]

Nor are we impressed with respondent's argument that his interpretation of "yield" is reasonable in light of his experience administering section 103(c) over the last decade, since we have previously concluded that that interpretation is unsupported by the legislative purpose behind section 103(c) as revealed in that section's legislative history.

Respondent argues that if petitioner is permitted to obtain a return on its investment securities high enough to allow it to recover its actual issuing expenses, then there will be no incentive for petitioner to keep its costs to' a minimum. Respondent's final regulation defining "yield" reflects a belief that his early definition of "yield" forced the Federal Government to shoulder the burden of excessively high issuing costs incurred by local governments but shifted to the national coffers by an alleged "cost recovery subsidy" implicit in the initial definition of "yield." Respondent's regulation interpreting "yield," so his argument seems to run, reasonably covers this unforeseen pitfall.

As we have observed (see pp. 665–666 & note 7 *supra*), petitioner *will* bear part of the issuing expenses because of the

---

[17]By eliminating the discount involved in the purchase of the refunding bonds at public auction, respondent is obviously seeking to treat such discount more as a commission than interest. Compare sec. 1.103–13(d), Income Tax Regs., with sec. 1.103–13(c)(1)(ii), Proposed Income Tax Regs., 41 Fed. Reg. 47683 (1976). We note, however, that it is far from clear that the discount obtained by an underwriter to compensate him for the risks of nonsale and rising interest rates are anything other than "interest" as that term is commonly used. Compare *United States Playing Card Co. v. Commissioner*, 15 B.T.A. 975, 981–982 (1929), with *Olinger Corp. v. Commissioner*, 9 B.T.A. 170 (1927). We further note that because the purchaser of the refunding bonds is not obliged to resell them, it may well be that much, if not all, of the expected original issue discount will inure to the purchaser because he will in fact keep the bonds until maturity. In addition, we note that in determining whether a "major portion" of the proceeds from a bond issue will be invested, respondent has not hesitated to adopt petitioner's definition of purchase price under the guise of "original proceeds." See sec. 1.103–13(b)(2)(i), –13(b)(1)(ii), Income Tax Regs. See also note 11 *supra*.

lack of correlation of the period over which the issuing expenses are taken into account in calculating yield on the issue and the period during which the proceeds of the refunding bonds will actually be invested in income-producing securities which is the basis for calculating the requisite comparative yield. Thus, there is a very real incentive for petitioner to keep its issuing costs (including original issue discount) as low as possible. We note that respondent has neither alleged that inflated expenses are present in the instant case nor suggested *why* they are likely to occur in the next, despite the issuer's interest to the contrary. Moreover, we think that should such excesses appear in the future, respondent may well be able to attack them as being *unnecessarily* incurred. Cf. note 11 *supra*.

We recognize that "some of [the] most valuable qualities" of administrative regulation are "ease of adjustment to change, flexibility in light of experience, [and] swiftness in meeting new or emergency situations" (*Helvering v. Wilshire Oil Co.*, 308 U.S. 90, 101 (1939)), thereby making clear that needed changes can be brought about by administrative regulation without awaiting an act of Congress. In the instant case, however, respondent declined to address the arbitrage issue himself, preferring instead to ask Congress to do so. Respondent's final interpretation is thus not only inconsistent with his prior interpretation, but is inconsistent with Congress' desires as expressed in section 103(c) and explained in its legislative history. Having avoided the administrative route in favor of congressional action and congressional imprimatur, respondent must reap what he has sown. The current, detailed version of section 103(c) is the product of respondent's request to Congress. Having now changed his mind, we think it incumbent on him to ask Congress to change the law, if it deems it appropriate to do so.[18]

---

[18]We recognize that our job is not to question the wisdom of respondent's administration of the laws. Yet, we feel constrained to note that respondent is pressing for what would be no more than a Pyrrhic victory. The Federal Government specially issues bonds to be purchased by local governments. The inevitable effect of reducing petitioner's allowable investment return is the issuance of additional bonds to produce the lost revenue. While the Federal Government will save *slightly* on its borrowing costs while the proceeds from the refunding bonds are invested in Federal obligations, the additional bonds will be outstand-

It is obvious that our analysis points to the conclusion that the definition of "purchase price" (as a component of "yield") contained in section 1.103–13(d)(2), Income Tax Regs. (see p. 665 *supra*), is invalid. We recognize, however, that respondent's definition must be upheld if it "[implements] the congressional mandate in some reasonable manner." *United States v. Correll*, 389 U.S. 299, 307 (1967). We further recognize that Congress vested broad rulemaking power in respondent (see sec. 103(c)(6), note 8 *supra*), and that such so-called "legislative" regulations promulgated pursuant to such broad grants of authority are entitled to greater deference from the courts than the so-called "interpretative" regulations issued under the general authority vested in respondent under section 7805. We find it unnecessary to attempt to delineate whether the regulation in question herein is "legislative" or "interpretative," although we think a strong argument can be made for the latter categorization in the context of this case,[19] since the regulation in question speaks to an issue addressed by Congress with particularity (see S. Rept. 91–552, *supra* at 219–220) in direct response to a request from the Treasury Department for a specific provision in lieu of a board grant of general authority to define "arbitrage bond" (see p. 668 *supra*). In any event, whether "legislative" or "interpretative," a regulation must "reasonably [relate] to the purposes of the enabling legislation." See *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369 (1973); *Bates v. United States*, 581 F.2d 575, 580 (6th Cir. 1978). Moreover, even if a regulation is not "technically inconsistent" with the statutory language it seeks to interpret, if it is "manifestly inconsistent" with what Congress "surely * * * intended" to do, then it cannot stand. *United States v. Cartwright*, 411 U.S. 546, 557 (1973).

---

ing for decades during which time the Federal Treasury will implicitly subsidize the *bondholders* by exempting the interest from Federal taxation. See generally M. Mussa & R. Kormendi, The Taxation of Municipal Bonds (1979); S. Surrey, Pathways to Tax Reform 210–222 (1973).

[19]Cf. *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981), 47 AFTR 2d 81–1513, 81–1519 n. 13, 81–1 USTC par. 9427; *American Bancorporation, Inc. v. Board of Governors of Federal Reserve System*, 509 F.2d 29, 34–35 (8th Cir. 1974). See generally 2 K. Davis, Administrative Law Treatise, sec. 7:8 (2d ed. 1979).

We have taken into account the foregoing guidelines to be utilized in determining the validity of respondent's regulation in light of our analysis of the legislative history and circumstances surrounding the enactment of section 103(c). See *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 93–94 (1934), where the Supreme Court stated—

The intention of the lawmaker controls in the construction of taxing acts as it does in the construction of other statutes, and that intention is to be ascertained, not by taking the word or clause in question from its setting and viewing it apart, but by considering it in connection with the context, the general purposes of the statute in which it is found, the occasion and circumstances of its use, and other appropriate tests for the ascertainment of the legislative will.

We think that respondent has exceeded the bounds of permissible administrative flexibility. By establishing a rule which has the effect of forcing local governments to lose money (see pp. 665–666 *supra*), he has constructed an unreasonable and unrealistic measure for determining yield. This he may not do. Cf. *United States v. Cartwright, supra.* Accordingly, we hold that respondent's regulations, section 1.103–13(d)(1) and (2), are invalid to the extent that they provide that administrative costs shall not be taken into account and that "bond houses, brokers, and other intermediaries" shall be excluded in determining the "purchase price." We therefore sustain petitioner herein.

*Decision will be entered accordingly.*

Reviewed by the Court.

CHABOT, *J.*, dissenting: The term, "yield," appears twice in subparagraph (A) of section 103(c)(2). The majority define the first "yield" one way and the second "yield" a different way; they acknowledge that the definition they assign to the second "yield" is not the literal meaning of this term; and they invalidate Treasury regulations which define both "yields" consistently with each other and with the common and accepted meaning of this term. Respectfully, I dissent.

Tax exemption is not available for interest on an arbitrage bond (sec. 103(c)(1)). The Congress defined "arbitrage bond" in paragraph (2) of section 103(c), as follows:

(2) ARBITRAGE BOND.—For purposes of this subsection, the term "arbitrage bond" means any obligation which is issued as part of an issue all or a major portion of the proceeds of which are reasonably expected to be used directly or indirectly—

  (A) to acquire securities (within the meaning of section 165(g)(2)(A) or (B)) or obligations (other than obligations described in subsection (a)(1) or (2)) which may be reasonably expected at the time of issuance of such issue, to produce a *yield* over the term of the issue which is materially higher (taking into account any discount or premium) than the *yield* on obligations of such issue, or

  (B) to replace funds which were used directly or indirectly to acquire securities or obligations described in subparagraph (A).

  [Emphasis supplied.]

The majority appear to agree that the first "yield" is to be calculated in terms of the rate of return to the bond *holder*, but refuse to apply the same meaning to the second "yield." The second "yield," they say, is to be calculated in terms of the cost to the bond *issuer*.

Of course, if the Congress had meant to describe two different concepts, one would have expected it to have used two different terms—e.g., "yield to the holder" and "cost to the issuer." However, the Congress used one term, in two places in the same subparagraph, enacted at one time. The majority ascribe an unusual degree of blindness to the Congress in giving such different meanings to these two proximate uses of the one term. Also, the majority ignore the instruction of the Supreme Court in *Commissioner v. Lester,* 366 U.S. 299, 304 (1961), as follows:

And, as we have frequently stated, the Code must be given "as great an internal symmetry and consistency as its words permit." *United States v. Olympic Radio & Television,* 349 U.S. 232, 236 (1955).

The majority concede that the literal language of section 103(c)(2)(A) requires a comparison in the instant case between (1) the rate of return to a holder of petitioner's bonds and (2) the rate of return to petitioner as a holder of U.S. Treasury obligations. Majority opinion at p. 669 *supra.* Focusing on the holder in defining the term "yield," gives to the term its common and accepted meaning in finance—the rate of return on investment. Webster's New International Dictionary 2973 (2d ed. 1959); G. Munn & F. Garcia, Encyclopedia of Banking and Finance 948 (7th ed. 1973); S. Levine, 1 Financial Analyst's Handbook 339 (1975). This focus on the holder is

evidently the meaning of "yield" as used in public advertisements of new issues of petitioner's obligations.

In refusing to give the second "yield" its common and accepted meaning, the majority ignore this Court's very recent guidance as to statutory interpretation in *Glass v. Commissioner*, 76 T.C. 949, 954–955 (1981), as follows:

The words by which "the legislature undertook to give expression to its wishes" are, however, usually the most "persuasive evidence" of the purpose and meaning of a statute. *United States v. Amer. Trucking Ass'ns.*, 310 U.S. 534, 543 (1940); *Gutierrez v. Commissioner*, 53 T.C. 394, 400 (1969), affd. per order (D.C. Cir. 1971). Unless the language of the statute is plainly at variance with some clearly defined legislative policy, we cannot look beyond the normal meaning of the words chosen by Congress. *Busse v. Commissioner*, 479 F.2d 1147, 1151–1153 (7th Cir. 1973), affg. 58 T.C. 389 (1972). * * *

The Treasury regulations provide a method for applying the term "yield" consistently, that is, a method for giving the term its common and accepted meaning in both places where the term appears in section 103(c)(2)(A). Notwithstanding this conformity of the regulations to the statutory scheme, the majority invalidate the regulations, essentially ignoring the Supreme Court's recent instructions in *Commissioner v. Portland Cement Co. of Utah*, 450 U.S. 156 (1981), regarding the standards that Court uses (and, presumably, this Court is to use) in testing the validity of regulations, as follows:

These regulations command our respect, for Congress has delegated to the Secretary of the Treasury, not to this Court, the task "of administering the tax laws of the Nation." *United States* v. *Cartwright*, 411 U.S. 546, 550 (1973); accord, *United States* v. *Correll*, 389 U.S. 299, 307 (1967); see 26 U.S.C. § 7805(a). We therefore must defer to Treasury Regulations that "implement the congressional mandate in some reasonable manner." *United States* v. *Correll*, 389 U.S. at 307; accord, *National Muffler Dealers Assn.*v. *United States*, 440 U.S. 472, 476–477 (1979). To put the same principle conversely, Treasury Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner* v. *South Texas Lumber Co.*, 333 U.S. 496, 501 (1948); accord, *Fulman* v. *United States*, 434 U.S. 528, 533 (1978); *Bingler* v. *Johnson*, 394 U.S. 741, 749–751 (1969). * * *

The basic reason given by the majority for their actions in the instant case is that the legislative history includes a number of statements of congressional concern about restricting "profits" on the issuance of State and local obligations. The majority refuse to affirm a rule that produces "a situation

which would force local governments to lose money." (Majority opinion at p. 673 *supra*.)

Firstly, the term "profit" is not itself an unambiguous term. Secondly, the Congress chose to enact "yield" and not "profit." (The term "yield" does have a common and accepted meaning, recognized by the majority and accepted by them as the meaning to be applied to the first place the term appears.) Thirdly, we have very recently discarded the notion that the Congress' enactment in this area should be construed narrowly, to deal only with the specific abuse situations that stirred the Congress to act. In *Fairfax County Economic Development Authority v. Commissioner*, 77 T.C. 546 (1981), we discussed both the arbitrage bond provisions and the industrial development bond provisions, and analyzed the Congress' actions as follows (p. 558):

In both cases, Congress attacked the general problem rather than the narrow, triggering incidents upon which its concerns were based, in order to prevent the erosion of the Federal tax base and protect the market for genuine State and municipal bonds. * * *

Given (1) our recent Court-reviewed analysis of what the Congress sought to do, (2) the likelihood that the regulations here invalidated would serve to "prevent the erosion of the Federal tax base and protect the market for genuine State and municipal bonds," (3) the consistency of the regulations with the statute, (4) the Congress' choice of words with common and accepted meanings, and (5) the Supreme Court's and our own Court's recent pronouncements about statutory construction, generally, and section 103(c), in particular, I must respectfully dissent from both the majority's conclusions and their reasoning.