105 T.C. No. 19


UNITED STATES TAX COURT


HARBOR BANCORP & SUBSIDIARIES, Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent

EDWARD J. KEITH AND ELENA KEITH, Petitioners
v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 24112-92, 5857-93.          Filed October 16, 1995.


The Housing Authority of Riverside County, California, issued revenue bonds to finance the construction of multifamily housing for families of low and moderate incomes. Ps purchased some of these bonds and, believing that the bonds were tax exempt, did not include the interest received thereon in income. Sec. 103(a), I.R.C., generally provides a tax exemption for interest earned on bonds issued by State and local governments. This exemption does not apply to "arbitrage bonds". Sec. 103(c), I.R.C. Under sec. 148(f), I.R.C., a bond is treated as an "arbitrage bond" if (1) the bond proceeds are used to purchase investments that are not acquired to carry out the governmental purpose of the bond issue; (2) the investment of the bond proceeds produces an excess amount of earnings described in sec. 148(f)(2), I.R.C.; and (3) the bond issuer fails to pay such excess amount to the United States. The Commissioner determined that the bonds should be treated as arbitrage bonds pursuant

to sec. 148(f), I.R.C., and that, as a result, the interest on the bonds was not excludable from Ps' income.

Held: The Commissioner's determination is upheld. The bonds are to be treated as arbitrage bonds pursuant to sec. 148(f), I.R.C. The interest on the bonds is not excludable from Ps' taxable income under sec. 103(a), I.R.C.

Anita C. Esslinger, Mary Gassmann Reichert, Brenda J. Talent, Juan D. Keller, Michael F. Coles, and Linda M. Martinez (specially recognized), for petitioner in docket No. 24112-92.

Mary Gassmann Reichert, Juan D. Keller, Michael F. Coles, and Linda M. Martinez (specially recognized), for petitioners in docket No. 5857-93.

Clifton B. Cates III, Lillian D. Brigman, Debra Lynn Reale, and Jon Kent, for respondent.

RUWE, Judge:[*] Respondent determined the following deficiencies in petitioners' Federal income taxes:

Harbor Bancorp & Subsidiaries
docket No. 24112-92

| Year | Deficiency |
| --- | --- |
| 1988 | $6,587 |
| 1989 | 6,588 |
| 1990 | 6,588 |

---

[*]This case was reassigned to Judge Robert P. Ruwe by order of the Chief Judge.

Edward J. and Elena Keith
docket No. 5857-93

| Year | Deficiency |
|------|-----------|
| 1989 | $14,709 |
| 1990 | 18,521 |
| 1991 | 14,840 |

These consolidated cases are test cases that involve the Commissioner's attempt to tax interest received on two multifamily housing revenue bonds (the Bonds) issued by the Housing Authority of the County of Riverside, California (the Housing Authority). The ultimate issue for decision is whether interest on the Bonds is excludable from gross income under section 103(a). This, in turn, will depend on the applicability of section 148(f). References to section 103 are to that section of the Internal Revenue Code of 1954,[1] as amended, and references to section 148 are to that section of the Internal Revenue Code of 1986.[2]

Some of the facts have been stipulated and are found accordingly. The stipulations of fact and attached exhibits are

---

[1]We apply sec. 103 of the 1954 Code as in effect for Feb. 20, 1986, instead of the 1986 Code, because (1) sec. 1301 of the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, 100 Stat. 2085, 2602, which amended sec. 103, became effective for bonds issued after Aug. 15, 1986, TRA sec. 1311(a), 100 Stat. 2659, and (2) the bonds we deal with were issued before that date.

[2]We apply sec. 148(f) of the 1986 Code, because (1) TRA sec. 1314(d)(1), 100 Stat. 2664, provides that sec. 103 of the 1954 Code shall be treated as including the requirements of sec. 148(f) of the 1986 Code for bonds issued after Dec. 31, 1985, and (2) we conclude, infra, that the bonds we deal with were issued after that date.

incorporated herein by this reference.  The trial judge made the following findings of fact, which we adopt.

FINDINGS OF FACT

At the time its petition was filed, the principal office of petitioner Harbor Bancorp & Subsidiaries was Long Beach, California.  Petitioners Edward J. and Elena Keith resided in Pebble Beach, California, when they filed their joint petition.

Riverside County is a political subdivision of the State of California, governed by an elected board of supervisors.  Within the Riverside County government exists the Housing Authority. The Housing Authority is empowered to issue revenue bonds, the proceeds of which are lent to private developers to construct housing projects.  The Riverside County Housing Authority Advisory Commission (Advisory Commission) was created to review proposed multifamily housing bond issuances.

By the mid-1980's, there was a large demand for low- and moderate-income housing in Riverside County.  In the fall of 1985, an established commercial and residential development company named SBE Development, Inc. (SBE), approached officials of Riverside County seeking "conduit financing"[3] to fund

---

[3]Conduit financing is distinguishable from "governmental financing" in which the bond proceeds would be used directly by the governmental unit in order to construct public facilities, such as roads, bridges, and schools.  Here, the Bond proceeds were not going to be used directly by the issuing governmental unit (the Housing Authority), but rather by a private developer,
(continued...)

construction of two multifamily housing projects in Riverside County. SBE was a California corporation founded in the early 1970's by Craig K. Etchegoyen, who was its chief executive officer and president. One of these projects was the Whitewater Garden Apartments (Whitewater), a proposed 460-unit multifamily rental project to be located in Cathedral City, California. Its anticipated cost was slightly more than $17 million. The other was the Ironwood Apartments (Ironwood), a proposed 312-unit project located in Moreno Valley, California. Its anticipated cost was slightly more than $12 million. Twenty percent of the apartment units to be constructed in each of these projects were to be set aside to provide housing for low-to-moderate-income families.

SBE submitted detailed information concerning the feasibility of the projects to Riverside County officials. Upon receipt of the development information, the Housing Authority and related county agencies conducted an extensive review of the proposals to determine the need, feasibility, cost effectiveness, accessibility, and desirability of these projects. The Housing Authority approved the projects and thereafter engaged the law firm of Camfield & Christopher to act as bond counsel.

James W. Newman, Jr., was a partner in the Houston office of the law firm of Stubbeman, McRae, Sealy, Laughlin & Browder

_____

(...continued)
a partnership in which SBE was the general partner.

(Stubbeman). Mr. Newman (and thereafter Stubbeman) acted as special tax counsel and underwriter's counsel on the Whitewater and Ironwood bond issues. Mr. Newman prepared the Bond documents used in the Whitewater and Ironwood deals. It is customary for bond counsel to draft, disseminate, and revise all documents needed to bring about the issuance of a tax-exempt bond. In this case, however, Stubbeman assumed that responsibility inasmuch as it was preparing several sets of similar documents for a number of other bond transactions to be issued at the same time as the Whitewater and Ironwood bonds.

The plan that was developed contemplated that two firms--Donaldson, Lufkin & Jenrette Securities (DLJ) and Drexel, Burnham, Lambert, Inc. (Drexel)--would be the underwriters on the Whitewater and Ironwood bond issues. Ira McCown, an investment banker at DLJ, was deeply involved in bringing the Whitewater and Ironwood bonds to market. The Interfirst Bank of Houston would be trustee for the bondholders. The financing plan further contemplated that the Housing Authority would issue the Bonds and then lend the Bond proceeds to a developer, in exchange for a developer note. The Housing Authority would then assign the developer note to the Trustee bank. The developer would make payments on its note to the Trustee bank. The developer would use the Bond proceeds, which were to be in a "developer loan fund", to construct the projects.

With respect to each project, SBE operated as a general partner of a partnership formed to act as the developer. The developer of the Whitewater Project was the Whitewater Limited Partnership (Whitewater, Ltd.), and the developer of the Ironwood Project was Ironwood Apartments, Ltd. (Ironwood, Ltd.).

Credit Enhancement

As security for the loan, each developer was to obtain an irrevocable letter of credit, in exchange for a second developer's note, called a "reimbursement note", secured by a mortgage on the property to be developed. The provider of the letter of credit would then discount the developer's note to another entity--the "mortgage purchaser"--in exchange for cash that the letter of credit provider would use to acquire, from a solid financial institution, a "guaranteed investment contract" (GIC). The GIC would be pledged to secure payment of interest and principal, under the letter of credit, to the bondholders. In effect, each developer would issue a second note in order to obtain a guaranteed means of repayment on its first note.

For the Ironwood project, the letter of credit provider was to be Mercantile Capital Finance Corp. No. 30 (MCFC No. 30) and for the Whitewater project, Mercantile Capital Finance Corp. No. 47 (MCFC No. 47). The sole shareholder of each of these corporations was James J. Keefe. The mortgage purchaser for both projects was Unified Capital Corp. (Unified). This entity was

owned by Mr. Keefe, Steven Tetrick, and Steve Jarchow.  Mr. Tetrick was Unified's chief executive officer.

Notice of Hearing

In November and December of 1985, the Housing Authority published notices of a hearing on the Ironwood bond issue in the Press Enterprise, a newspaper of general circulation in Riverside County.  Subsequently, on December 17, 1985, the Housing Authority authorized the issuance of the Ironwood bonds in the amount of $13 million.

Apparently because of staff oversight, there was no newspaper publication concerning hearings held on December 3, 1985, on the Whitewater bonds by both the Advisory Commission and the Housing Authority.  However, both the Housing Authority and the Advisory Commission followed notification procedures for such hearings under a California statute known as the Brown Act.  As required by the Brown Act, the Advisory Commission posted notices containing the agenda of its December 3, 1985, meeting regarding the proposed issuance of the Whitewater bonds at least 72 hours prior to the date thereof.  The notice containing the agenda was posted at Riverside County's eight public housing projects and at the Indio and Riverside County Housing Authority offices.  Listed in the notice as "New Business" was "Recommend approval of Resolution Number 85-052 - Bond Financing - Whitewater Garden Apartments Multi-Family Housing Revenue Bond ($17,200,000)."

Also as required under the Brown Act, the Housing Authority gave notice by distributing several hundred copies of its agenda throughout Riverside County at least 72 hours in advance of its hearings. The copies were distributed to all personnel in the office of the clerk of the board of supervisors, members of the board of supervisors, local news media (including the Press Enterprise), the county courthouse (for public posting in the clerk's office), all county offices, and a list of developers and attorneys. The notices stated that at the December 3, 1985, meeting of the board of supervisors and Housing Authority, consideration would be given to "Resolution 85-709 approving the issuance of bonds by the Housing Authority of the County of Riverside for the SBE Development Corp. Project ($17,200,000)." A notice for a special meeting of the Housing Authority on December 10, 1985, announced that the Housing Authority would give consideration to "Resolution 85-052 approving the Whitewater Garden Apartments Multi-family issuance of tax-exempt revenue bonds and approving documentation for issuance of revenue bonds."

Early in December 1985, the board of supervisors of Riverside County authorized the issuance of the Whitewater bonds in the amount of $17,200,000 and, a week later, transferred its rights and duties with respect to such issuance to the Housing Authority.

Preclosing Activities

Prior to closing on the Whitewater and Ironwood bond issues, officials of the Housing Authority, Riverside County's counsel, the trustee's officers and its counsel, and bond counsel all engaged in reviewing drafts of the Bond documents.

On December 17, 1985, William A. Rosenberger, executive director of the Housing Authority, executed a "Non-Arbitrage Certificate" for the Whitewater and Ironwood bonds. Therein, he represented that the Housing Authority, as issuer of the Bonds, reasonably expected that the Bond proceeds would be used for the construction of multifamily housing. He further represented that, except for a permissible temporary period, the Bonds would not be invested in higher yielding taxable securities in an attempt to gain arbitrage profits. Bond counsel checked with the county government and were informed that notices of hearings on the Bonds had been published.

The parties to the Bond issuances then attended a preclosing at the Stubbeman office in Houston in mid-December 1985. Mr. Christopher, as the Housing Authority's bond counsel, represented Riverside County. Also present at the preclosing were Mr. Newman and two other lawyers from the Stubbeman firm, Mr. McCown from DLJ, and representatives from Unified. The purpose of the preclosing was to obtain signatures and otherwise put the documents into form for the final closing. The Stubbeman firm

held the documents so executed in escrow pending the final closing.

## Changes in the Program

Because of a pending change in the tax law setting forth restrictive new arbitrage rebate rules on bonds issued after December 31, 1985, there was considerable pressure for local governments to issue multifamily housing bonds on or before December 31, 1985. As the anticipated December 31, 1985, closing date approached, principals of DLJ informed Mr. McCown that the firm was financially unable to underwrite the large number of tax-exempt bonds that were scheduled for closing on December 31, 1985. Mr. McCown scrambled to find another underwriter. (Drexel had lessened its involvement in underwriting these types of securities by this time and was not a viable alternative.)

Mr. McCown was on good terms with Arthur Abba Goldberg, vice president of the investment firm of Matthews & Wright, Inc., a Wall Street underwriter. Mr. Goldberg told Mr. McCown that his firm would underwrite the Bond transactions. Mr. McCown then informed Mr. Newman that the Matthews & Wright firm would do the underwriting. Mr. Newman had dealt with Matthews & Wright in the past and agreed to the substitution of underwriters.

Prior to being sold to the public, the Bonds needed to be rated by a recognized rating agency, such as Standard & Poor's Corp. Because the rating agencies needed a period of time to

rate the Bonds, the Bonds were to be "temporarily warehoused"--that is, the Bonds were to be sold and held prior to their ultimate sale to the investing public. Two days before closing, a representative from Matthews & Wright informed Mr. Newman that an entity known as the Commercial Bank of the Americas, Ltd., located on the island of Saipan in the Northern Marianas, would purchase the Bonds from Matthews & Wright and hold them for temporary "warehousing". Mr. Newman subsequently discovered that the Commercial Bank of the Americas no longer had a banking charter and was operating simply as a corporation.

On December 30, 1985, Mr. Newman instructed Richard B. Hemingway, an associate in the Stubbeman firm, to take the Whitewater, Ironwood, and 16 other bond certificates to New York. Karen J. Cole, a representative of Interfirst Bank, was also in New York on other business on December 31, 1985. Although she had little prior involvement in the Bonds' issuance, she was asked to go to the offices of Matthews & Wright to attend the closing.

Mr. Goldberg headed a federal credit union named New American Federal Credit Union, located in Jersey City, New Jersey (the credit union). On December 31, 1985, Mr. Goldberg instructed Joel S. Schwartz, the general manager of the credit union, to come to Matthews & Wright and to bring "starter kit"

books of the credit union's share drafts[4] with him. Mr. Goldberg informed Mr. Schwartz that he (Mr. Schwartz) would be signing documents as a representative of the Commercial Bank of the Americas.

On December 31, 1985, using credit union starter kits, personnel at the offices of Matthews & Wright prepared the endorsements and typed out the faces of 24 share drafts. These included a share draft payable to Interfirst as trustee in the amount of $17,613,020.83 for Whitewater, and another in the amount of $13,083,958.33 for Ironwood. On that day, share drafts totaling approximately $750 million were drawn by Matthews & Wright on a nonexistent account at the credit union.

At the closing, Mr. Hemingway showed the documents relating to the issuance of the Bonds to Ms. Cole and then delivered them to Mr. Goldberg. Following directions from her home office, Ms. Cole received the Whitewater and Ironwood share drafts. She endorsed these share drafts "without recourse" to the Commercial Bank of the Americas to purchase two investment agreements from that institution. As of December 31, 1985, the Commercial Bank of the Americas had no apparent assets in excess of $5,011 in an account with the Bank of Guam.

Mr. Schwartz, on behalf of the Commercial Bank of the Americas, then endorsed these share drafts back to Matthews &

---

[4]These "share drafts" were the functional equivalent of a check drawn on the credit union.

Wright.  He did so as an accommodation to Mr. Goldberg, who told him that it was a legitimate transaction.  An employee of Matthews & Wright then restrictively endorsed these share drafts for deposit to the account of Matthews & Wright.  These share drafts did not enter any banking channels; instead, Mr. Schwartz took them home over New Year's Eve and later kept them in a file at the credit union.

Also, on December 31, 1985, in Houston, Interfirst's officer, H. Bradbury Foster, exchanged cross-receipts with Mr. McCown, who was now representing Matthews & Wright's interests. Interfirst recorded evidence of the share drafts and of their exchange for the investment agreements on its corporate trust books for December 31, 1985.

Officers of Interfirst were familiar with Matthews & Wright as being a Wall Street underwriter of tax-exempt municipal bonds. Just before the closing, they were informed that the Bonds would be held and warehoused by the Commercial Bank of the Americas in exchange for its investment agreements.  Mr. Foster found the Commercial Bank of the Americas listed in an international banking directory.  The information in the directory matched the information concerning the bank he had received from Mr. Newman. Mr. Foster also contacted Interfirst's international department, which verified his information.  Interfirst's head office then referred him to the bank's New York international office.  That office also verified the information he had received.  When

Interfirst received the share drafts, it had no reason to believe that they could be dishonored.

Because the Stubbeman firm was responsible for a number of closings in New York, and because it was issuing the tax opinion in those issues, it was decided that the Stubbeman firm, rather than Mr. Christopher's firm (the actual bond counsel) would be present. Mr. Christopher had no reason to mistrust the Stubbeman firm.

On or about December 31, 1985, Mr. Newman telephoned Mr. Christopher to tell him that the Bonds had been sold. Mr. Newman did not, however, immediately inform bond counsel or county authorities of the change in underwriters. Mr. Newman did not convey to bond counsel the fact that a substitution of underwriters had occurred until after the beginning of 1986. Thus, Mr. Christopher first learned on February 10, 1986, from a Drexel employee that Matthews & Wright--and not DLJ--was warehousing the Bonds. Mr. Christopher was upset with the news. He telephoned Mercantile Capital Corp., leaving a message as to his displeasure at not being informed of the change in underwriters. Two days later he further learned that Drexel was out of the deal. On the same day, he was advised by Mr. Newman that because the Bond documents were still in escrow, they could be amended without following formal amendment procedures.

Had Mr. Christopher been aware of the developments surrounding the issuance of the Bonds, he would not have

authorized the use of his opinion.  He would have recommended that the Housing Authority not proceed with the issuance.

Neither Mr. Rosenberger nor anyone else in the Housing Authority knew of the switch in underwriters until February 1986, when Mr. Rosenberger was advised of the change by bond counsel. Mr. Rosenberger believed that the closing on the issuance of the Bonds occurred on December 31, 1985.  As chief of the Riverside County Housing Authority, Mr. Rosenberger relied upon county counsel and bond counsel to advise him with respect to the documents and to discuss any terms that might cause a potential problem.

County counsel had not been made aware of these problems. Mr. Anthony Wetherbee served as deputy county counsel and was primarily responsible for reviewing bond issuances of Riverside County during 1984 and 1985.  He typically consulted with bond counsel concerning documentation for a given bond issue.  Mr. Wetherbee participated in about 30 or 40 bond closings for Riverside County.  With respect to the Ironwood and Whitewater issuances, he observed that they differed from other financing in several ways.  For example, most of the documents were being prepared by the underwriter's counsel, the Stubbeman firm, and not by bond counsel.  The closing was to take place out of State, but that was not unusual because the primary attorneys (the Stubbeman firm) were in Texas.  Another distinguishing factor was that the Bonds were to be "warehoused"--kept by the underwriters

until they were rated by a rating agency and made available to the investing public.  Mr. Wetherbee was aware of a sense of urgency in issuing the Bonds before the end of 1985 because of a pending change in the tax laws.  These differences, however, did not operate as a "flag" to indicate that anything was improper with the issuance.  Had Mr. Wetherbee been informed of the details concerning the alleged closing and the subsequent remarketing of the Bonds, he would not have recommended that the Housing Authority proceed, and, in his opinion, the Housing Authority would not in fact have proceeded with the financing.

After December 31, 1985, as a result of the change in the underwriter, bond counsel urged the Housing Authority to pass a resolution ratifying assignment of the underwriting agreement to Matthews & Wright.  The Housing Authority did so.

## Events of February 20, 1986

A number of carefully orchestrated events occurred on February 20, 1986, most of them taking place by wire transfers. First, Matthews & Wright borrowed $58,475,287.37 from Security Pacific National Bank (Security Pacific) pursuant to an existing credit arrangement.  The money was then wire transferred to Chase Manhattan Bank for the account of the New American Federal Credit Union, and for further credit to the Commercial Bank of the Americas in order to purchase, inter alia, the Bonds.  Matthews & Wright pledged the Bonds, among other things, as collateral for

the loan. (Matthews & Wright repaid this loan later in 1986 using funds received from the sale of the Bonds to the investing public.) The money from Security Pacific, less an amount paid to redeem a relatively small amount of the Ironwood bonds, ultimately went to the Heritage National Bank of Austin, Texas (Heritage). Heritage deposited $17,778,146.53 of these funds into the "developer loan fund" account of Whitewater, Ltd. Of this amount, $1,425,000 was used to purchase land for the Whitewater project.

Whitewater, Ltd., had agreed to provide credit enhancement for the Whitewater bonds by obtaining a letter of credit. To arrange for this letter of credit, Whitewater, Ltd., entered into an agreement with MCFC No. 47 and gave MCFC No. 47 a reimbursement note, secured by a First Deed of Trust on the Whitewater project. On the same day, pursuant to a "deposit agreement", Whitewater, Ltd., transferred the $17,778,146.53 from its developer loan fund at Heritage to Unified's account at Heritage. This transaction was made pursuant to an understanding that Unified would disburse the Bond proceeds, as needed, for construction. This deposit agreement was not revealed to the Housing Authority or its counsel. Using the bond proceeds from Whitewater's developer loan fund, Unified then purchased Whitewater, Ltd.'s reimbursement note, secured by the First Deed of Trust, from MCFC No. 47 for $16,110,817.98. MCFC No. 47 used this $16,110,817.98 to purchase a "Settlement Annuity Contract"

from Crown Life Insurance Co. (This was the Whitewater Guaranteed Investment Contract, or Whitewater GIC.) Thus, the source of the funds from which the Whitewater bonds would be paid was now Crown Life Insurance Co.

Similar transactions also took place on February 20, 1986, with the $12,190,843.34 proceeds of the Ironwood bonds. These proceeds were deposited in an Ironwood, Ltd., account at Heritage. Ironwood, Ltd., gave a reimbursement note, secured by a similar mortgage on the Ironwood property, to MCFC No. 30 in exchange for a letter of credit securing payment of the Ironwood bonds. But again, without the knowledge of the Housing Authority, Ironwood, Ltd., deposited the $12,190,843.34 proceeds with Unified. Using these proceeds, Unified purchased the Ironwood reimbursement note from MCFC No. 30 for $11,047.408.05. MCFC No. 30 used this latter amount to purchase a "Settlement Annuity Contract" from Crown Life Insurance Co. (This was the Ironwood Guaranteed Investment Contract, or Ironwood GIC.)

Although most of the Bond proceeds went into the GIC's, substantial sums were used to pay fees, including fees to Stubbeman, Unified, and MCFC Nos. 30 and 47. The Housing Authority, however, only received reimbursement of administrative fees of $16,250 in connection with the issuance of the Ironwood bonds, and $21,375 with respect to the Whitewater bonds.

Once the money went into the GIC's, it was there irrevocably. Although the proceeds available to buy the GIC's

were diminished by numerous fee payments, because the GIC's paid interest at higher rates than the Bonds, the remaining proceeds were sufficient to guarantee payment of both principal and interest to the holders of the Bonds. In fact, the payments yielded by the Whitewater and Ironwood GIC's exactly equaled the debt service requirements needed to pay the bondholders.

Pursuant to "Collateral Security Agreements", MCFC Nos. 47 and 30 pledged the Whitewater and Ironwood GIC's as security and as sources of payment to the trustee, so that the trustee might make scheduled payments to the Whitewater and Ironwood bondholders.

Events After February 20, 1986

Standard & Poor's rating service noted that payment of principal and interest for the Bonds was secured by guaranteed investment contracts issued by a solid insurance company. This security was sufficient for Standard & Poor's to issue a Triple-A rating for the Bonds. Nevertheless, the effect of the diversion of Bond proceeds from the developer loan fund to the purchase of the GIC's was that no moneys were available to be expended on construction of the projects. Mr. Etchegoyen of SBE, the general partner of the Whitewater and Ironwood developers, sought funds from the deposit agreements with Unified so that he might undertake construction of the projects, but Unified refused. When he sought to determine why he could not get the funds, Mr.

Tetrick, the president of Unified, provided him with excuses, saying that Mr. Tetrick would have to check with Mr. Keefe, who headed the MCFC entities.

In the absence of funds, the Whitewater project was not constructed. In an assignment dated August 4, 1987, Unified assigned its rights under the Ironwood reimbursement note to Far West Savings and Loan Association, which replaced Unified as the construction lender. SBE issued a new note to Far West Savings, secured by a deed and an assignment of rents. The deed identified the Ironwood bonds at issue and stated, in pertinent part:

> the proceeds of the Bonds * * * are to be loaned to
> Trustor for the purpose of providing construction and
> permanent financing for the acquisition of that certain
> real property situate[d] in the County of Riverside
> * * *

The Ironwood project, currently operating under the name Cross Creek Village, was completed in March 1989 with funds borrowed from Far West Savings and Loan Association. The resulting capital construction costs allocated to the Ironwood project were more than 90 percent of the face amount of the Ironwood bonds. When they were occupied, 20 percent of the apartments were occupied by persons of low or moderate income. SBE suffered severe financial reverses as a result of defaulting on these projects, and Mr. Etchegoyen eventually lost his company to his creditors.

In 1988, Mr. Newman pleaded guilty to criminal charges in connection with the issuance of other purported tax-exempt bonds that supposedly closed on December 31, 1985. Mr. McCown resigned from DLJ and, in 1990, pleaded guilty to aiding and abetting the filing of false tax returns in connection with the Matthews & Wright tax-exempt bond transactions. Mr. Goldberg was indicted, with others, in connection with certain bond transactions in the Territory of Guam and negotiated a plea arrangement.

Petitioners' Bond Purchases

On July 25, 1986, Harbor Bancorp acquired Whitewater bonds with a face amount of $250,000. In the same month, the Keiths acquired Ironwood bonds with a $400,000 face amount and Whitewater bonds with a face amount of $300,000. Harbor Bancorp received $19,375 of interest on the Whitewater bonds in each of the years 1988, 1989, and 1990. The Keiths received $54,250 of interest on the Whitewater and Ironwood bonds in each of the years 1989, 1990, and 1991. Neither Harbor Bancorp nor the Keiths included the interest received on the Bonds in the gross income that they reported on their Federal income tax returns for the years in issue.

On February 20, 1991, the Commissioner notified the Housing Authority that the interest paid on the Bonds would be treated as taxable income to the bondholders unless the Housing Authority paid, to the United States, the amount required by section

148(f), which the Commissioner determined to be $2,250,475 with respect to the Whitewater bonds, and $1,543,199 with respect to the Ironwood bonds.[5]  The Housing Authority refused to make such payments.

OPINION

Section 103(a) generally excludes interest earned on State and local government bonds from taxable income.  This exclusion, however, does not apply to "arbitrage bonds".  Sec. 103(c)(1).[6] Section 103(c)(2) defines an arbitrage bond generally as a bond the proceeds of which are "reasonably expected" to be used to acquire higher yielding investments.  Section 148(f)(1) provides that if the requirements of section 148(f)(2) are not met, State and local government bonds will be "treated as" arbitrage bonds. Respondent's primary argument is based on section 148(f). Accordingly, we will first consider whether the Bonds should be treated as arbitrage bonds under section 148(f).

---

[5]On June 20, 1991, the Housing Authority filed an action in the U.S. District Court in Los Angeles, California, seeking a preliminary injunction enjoining the Internal Revenue Service from declaring the interest on the Bonds taxable.  On June 20, 1991, Judge Marshall of the District Court granted a preliminary injunction.  On July 23, 1992, she dissolved the injunction, ruling that the court lacked jurisdiction.  No decision on the merits was entered.

[6]Sec. 103(c)(1) provides that "any arbitrage bond shall be treated as an obligation not described in subsection (a)(1) or (2)."

Section 148(f) was enacted by the Tax Reform Act of 1986, and it is applicable to bonds issued after December 31, 1985. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1314(d), 100 Stat. 2664.[7]  Thus, our initial determination must be whether the Bonds were issued on December 31, 1985, as petitioners contend, or on February 20, 1986, as respondent contends.  This is a mixed question of fact and law, and we adopt the following analysis and findings of the trial judge regarding the date on which the Bonds were issued.

"Date of issue" is defined in section 1.103-13(b)(6), Income Tax Regs., as

> the date on which there is a physical delivery of the
> evidences of indebtedness in exchange for the amount of
> the issue price.  For example, obligations are issued
> when the issuer physically exchanges the obligations
> for the underwriter's (or other purchaser's) check.[8]

---

[7]TRA sec. 1314(d), 100 Stat. 2664, provides:

Except as otherwise provided in this subsection, in the
case of a bond issued after December 31, 1985, section
103 of the 1954 Code shall be treated as including the
requirements of section 148(f) of the 1986 Code in
order for section 103(a) of the 1954 Code to apply.

[8]Respondent insists that the proper definition of "issue
date" for the Bonds involved here is that contained in sec.
1.150-1(c)(2), 57 Fed. Reg. 21032 (May 10, 1994), which provides:

    (2) Date of Issue.  The date of issue of a bond
is the first day on which there is physical delivery of
the written evidence of the bond in exchange for the
purchase price.  Such day shall not be earlier than the
first day on which interest begins to accrue on the
                                              (continued...)

Courts have never regarded "the simple expedient of drawing up papers" as controlling for tax purposes when the objective realities are to the contrary. Commissioner v. Tower, 327 U.S. 280, 291 (1946). Here, the hastily drawn up papers used at the putative closings on December 31, 1985, utterly fail to reflect objective reality. The alleged payment for the Bonds took the form of share drafts from starter kits, drawn on nonexistent accounts at a Jersey City credit union. The agent of the trustee promptly endorsed these items, without recourse to the trustee, to the order of an undercapitalized institution located in Saipan that had recently lost its banking license. In exchange, the trustee took the Saipan institution's investment agreements. If, on December 31, 1985,--the alleged "date of issue"--the trustee had sought either to cash the share drafts or to collect upon its investment agreements, it would have been unsuccessful. Neither the share drafts nor the investment agreements had any substance behind them. These items fell embarrassingly short of representing actual payment for the Bonds within the meaning of the Commissioner's regulations. Accordingly, the date of issue of the Bonds was not December 31, 1985, but rather February 20, 1986, when actual funds were transferred from Security Pacific

---

(...continued)
    bond for federal income tax purposes.

Suffice it to say our determination as to the date of issue would be the same under either version.

Bank to Chase Manhattan Bank and subsequently to Heritage, to the credit of the developer partnerships and then to Unified. Because the Bonds were issued after December 31, 1985, section 148(f) applies.

Section 148(f)(1) provides that a bond shall be treated as an arbitrage bond unless the amount described in section 148(f)(2) is paid to the United States.  Such amount is equal to the sum of:

       (A) the excess of--

          (i) the amount earned on all nonpurpose investments (other than investments attributable to an excess described in this subparagraph), over

          (ii) the amount which would have been earned if such nonpurpose investments were invested at a rate equal to the yield on the issue, plus

       (B) any income attributable to the excess described in subparagraph (A),

Sec. 148(f)(2).  Payments required by section 148(f)(2) are generally required to be made at 5-year intervals.  Each required installment must be in an amount that ensures that 90 percent of the amount described in section 148(f)(2) has been paid, and full payment must be made with the last installment.  Sec. 148(f)(3).[9]

---

[9]Sec. 148(f)(3) provides in part:

Except to the extent provided by the Secretary, the amount which is required to be paid to the United

(continued...)

Failure to pay the required amount results in the bond's being treated as an arbitrage bond, which results in the loss of tax-exempt status.

The parties have stipulated that no payments required by section 148(f) were made to the United States.  Therefore, if (1) the Whitewater and Ironwood GIC's constitute nonpurpose investments of the proceeds of the Bonds, and (2) these investments earned a higher rate of return than the yield rate on the Bonds, then the Bonds must be treated as arbitrage bonds pursuant to section 148(f).

A "nonpurpose investment" is defined as any investment property that is acquired with the gross proceeds of a bond issue and is not acquired to carry out the governmental purpose of the issue.  Sec. 148(f)(6)(A).  "Gross proceeds" include any amounts actually or constructively received from the sale of the bonds as well as any amounts received from investing the original proceeds

(...continued)
> States by the issuer shall be paid in installments which are made at least once every 5 years.  Each installment shall be in an amount which ensures that 90 percent of the amount described in paragraph (2) with respect to the issue at the time payment of such installment is required will have been paid to the United States.  The last installment shall be made no later than 60 days after the day on which the last bond of the issue is redeemed and shall be in an amount sufficient to pay the remaining balance of the amount described in paragraph (2) with respect to such issue.

There is no dispute that the Housing Authority of Riverside County has not made such a payment within the time prescribed by sec. 148(f)(3).

of the bond issue.  Sec. 148(f)(6)(B); sec. 1.148-8(d)(1)-(5), Income Tax Regs.

The Whitewater and Ironwood GIC's were acquired with the gross proceeds of the Whitewater and Ironwood bond issues, respectively.  These proceeds were first placed in developer loan fund accounts and then transferred to Unified.  Unified then transferred most of these proceeds to the MCFC entities, which, in turn, used them to purchase the GIC's.  Following the flow of funds on February 20, 1986, it is clear that $16,110,817.98 of Whitewater bond proceeds and $11,047,408.05 of Ironwood bond proceeds were expended to acquire the GIC's.  The governmental purpose for the issuance of the Whitewater and Ironwood bonds was the construction of low- and moderate-income multifamily housing projects.  The GIC's were not acquired to carry out this governmental purpose.  Accordingly, the GIC's constituted nonpurpose investments within the meaning of section 148(f)(6)(A).

Petitioners argue that the GIC's do not constitute nonpurpose investments, because neither the Housing Authority nor the developer made an "investment decision".  Petitioners ask this Court to construe the meaning of "nonpurpose investment" to exclude any unauthorized investment.[10]  However, the statute does

---

[10]Petitioners also argue that the Treasury's regulation defining "nonpurpose investment" is invalid, because the definition therein is broader than the definition in the statute. We fail to see a significant difference in the definitions.  Sec.
(continued...)

not provide such an exclusion.  Section 148(f)(6)(A) defines a nonpurpose investment broadly to include any investment property that is acquired with the gross proceeds of an issue, and is not acquired to carry out the governmental purpose of the issue.[11] While the Housing Authority did not directly purchase the GIC's

---

(...continued)
148(f)(6)(A) defines "nonpurpose investment" as any investment property that is acquired with the gross proceeds of an issue and is not acquired to carry out the governmental purpose of the issue.  Sec. 1.148-8(e)(9), Income Tax Regs., defines "nonpurpose investment" as any investment that is not a purpose investment. "Purpose investment" is defined as any investment that is allocated to the gross proceeds of an issue and that is acquired to carry out the governmental purpose of the issue.  Sec. 1.148-8(e)(10), Income Tax Regs.  In any event, we have relied upon the statutory definition for purposes of our holding.

[11]Sec. 148(f)(6) provides:

(6) Definitions.--For purposes of this subsection and subsections (c) and (d)--

(A) Nonpurpose Investment.--The term "nonpurpose investment" means any investment property which--

(i) is acquired with the gross proceeds of an issue, and

(ii) is not acquired in order to carry out the governmental purpose of the issue.

(B) Gross proceeds.--Except as otherwise provided by the Secretary, the gross proceeds of an issue include--

(i) amounts received (including repayments of principal) as a result of investing the original proceeds of the issue, and

(ii) amounts to be used to pay debt service on the issue.

and, presumably, did not intend that the Bond proceeds be used to purchase the GIC's, the GIC's were in fact purchased with the proceeds of the Bonds and committed to provide funds for the repayment of principal and interest on the Bonds rather than for the governmental purpose of constructing multifamily housing. Thus, the GIC's fall within the statutory definition of nonpurpose investments.

Next, we must determine whether there was an amount earned on the nonpurpose investments that exceeded the amount that would have been earned if the nonpurpose investments had been invested at a rate equal to the yield on the Bond issues (hereinafter sometimes referred to as the excess amount). Sec. 148(f)(2).[12] An amount earned within the meaning of section 148(f)(2) is an amount actually or constructively received by the bond issuer from the nonpurpose investment. See secs. 1.148-2(b)(2)(i), 1.148-8(d)(5), Income Tax Regs.[13] Here, the amounts earned on

---

[12]Sec. 148(f)(4) contains special rules for applying par. (2). Petitioners make no claim that these special rules require any modification to the computation of the excess amount defined in sec. 148(f)(2), and we find nothing in par. (4) that would modify the literal application of par. (2) to the facts in this case.

[13]Sec. 1.148-2(b)(2)(i), Income Tax Regs., provides:

The term "receipt" means, with respect to an investment allocated to an issue, any amount actually or constructively received with respect to the investment. Except as provided in § 1.148-4(c)(3), receipts are not reduced by selling commissions, administrative expenses, or similar expenses. * * *

(continued...)

the GIC's were constructively received by the Housing Authority because the proceeds of the GIC's were used to pay the debt service on the Bonds that the Housing Authority had issued.[14]

Logic indicates that the amount earned on the nonpurpose investments (the GIC's) was substantially in excess of the amount which would have been earned if the amounts invested in the GIC's had been invested at a rate equal to the yield on the Bond issues. The amount available to buy the GIC's--the Bond proceeds--had been diminished by substantial fee payments and by the purchase of land. Nevertheless, the payments yielded by the Whitewater and Ironwood GIC's exactly equaled the debt service payments specified in the Bond documents. Because an amount that was substantially less than the Bond proceeds was invested in the GIC's, and because the GIC's nevertheless generated enough revenue to pay the Bonds' debt service requirements, it follows that the GIC's paid interest at higher rates than the yield on the Bonds. It further follows that amounts earned on the

_____

(...continued)

Sec. 1.148-8(d)(5), Income Tax Regs., provides:

The term "investment proceeds" means, with respect to an issue, any amounts actually or constructively received from investing original proceeds of the issue.

[14]Satisfaction of a debtor's obligation by means of a third party's payment to the creditor is the equivalent of receipt by the debtor. Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 729 (1929); Amos v. Commissioner, 47 T.C. 65, 70 (1966); see Bintliff v. United States, 462 F.2d 403, 408 (5th Cir. 1972).

investment of a given sum at the rate of the higher yielding GIC's would substantially exceed amounts earned upon investment of that same sum at the yield rate of the Bonds.

The regulations calculate the excess amount to be paid to the United States as the future value of all nonpurpose receipts over the future value of all nonpurpose payments. Sec. 1.148-2(a)(1) and (2), Income Tax Regs. "Receipts" are defined to include any amount actually or constructively received with respect to the investment (but not reduced by administrative or similar expenses). Sec. 1.148-2(b)(2)(i), Income Tax Regs.[15] "Payments" are defined to include the amount of gross proceeds of the bond issue to which the investment is allocated (not including administrative or similar expenses), whether or not the investment was directly purchased with such gross proceeds. Sec. 1.148-2(b)(3)(i) and (ii), Income Tax Regs.

The parties have stipulated the schedule of payments for and receipts pursuant to the Whitewater GIC as follows:

| Date | Payment | Receipt |
|---|---|---|
| 2/20/86 | $16,110,817.98 | |
| 5/27/86 | | $678,125 |
| 11/26/86 | | 678,125 |
| 5/27/87 | | 678,125 |
| 11/25/87 | | 678,125 |
| 5/27/88 | | 678,125 |
| 11/25/88 | | 678,125 |

---

[15]For an investment held at the end of a computation period, the term "receipt" includes the fair market value of the investment at the end of that period. Sec. 1.148-2(b)(2)(iii), Income Tax Regs.

| | |
|---|---:|
| 5/26/89 | 678,125 |
| 11/24/89 | 678,125 |
| 5/25/90 | 678,125 |
| 11/26/90 | 678,125 |
| 5/24/91 | 678,125 |
| 11/26/91 | 678,125 |
| 5/27/92 | 678,125 |
| 11/25/92 | 678,125 |
| 5/27/93 | 678,125 |
| 11/26/93 | 18,178,125 |

Similarly, the schedule of payments for and receipts pursuant to the Ironwood GIC has been stipulated by the parties as follows:

| Date | Payment | Receipt |
|---|---|---|
| 2/20/86 | $11,047,408.05 | |
| 5/27/86 | | $465,000 |
| 11/26/86 | | 465,000 |
| 5/27/87 | | 465,000 |
| 11/25/87 | | 465,000 |
| 5/27/88 | | 465,000 |
| 11/25/88 | | 465,000 |
| 5/26/89 | | 465,000 |
| 11/24/89 | | 465,000 |
| 5/25/90 | | 465,000 |
| 11/26/90 | | 465,000 |
| 5/24/91 | | 465,000 |
| 11/26/91 | | 465,000 |
| 5/27/92 | | 465,000 |
| 11/25/92 | | 465,000 |
| 5/27/93 | | 465,000 |
| 11/26/93 | | 12,465,000 |

Utilizing the procedures outlined in sections 1.148-2 and 1.148-8, Income Tax Regs.,[16] respondent has undertaken to show how much the amount earned on the GIC's exceeded the amount which would have been earned if the GIC's had been invested at a rate

---

[16]Sec. 148(i) provides that "The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this section."

equal to the yield on the Bond issues.  These calculations
indicate that the yield of the Whitewater GIC was 9.5520 percent,
and the yield of the Whitewater bonds was 7.3750 percent.  As of
February 20, 1991, the first computation date, respondent's
calculations indicate that the future value of the earnings on
the Whitewater GIC exceeded the amounts that would have been
earned if the GIC were invested at the yield rate of the
Whitewater bonds by $2,079,204.05.[17]  Equivalent calculations for
the Ironwood bonds show that the yield on the Ironwood GIC was
again 9.5520 percent while the yield on the Ironwood bonds was
7.6652 percent, generating an excess of $1,242,876.71 as of the

---

[17]Respondent computed this excess as follows:

| | Payment | Receipt | Future Value | Days To Comp. |
|---|---|---|---|---|
| 2/20/86 | (16,110,817.98) | | (23,140,973.48) | 1800 |
| 5/27/86 | | 678,125.00 | 955,210.32 | 1703 |
| 11/26/86 | | 678,125.00 | 921,424.96 | 1524 |
| 5/27/87 | | 678,125.00 | 888,477.02 | 1343 |
| 11/25/87 | | 678,125.00 | 857,224.42 | 1165 |
| 5/27/88 | | 678,125.00 | 826.405.87 | 983 |
| 11/25/88 | | 678,125.00 | 797,336.65 | 805 |
| 5/26/89 | | 678,125.00 | 768,825.81 | 624 |
| 11/24/89 | | 678,125.00 | 741,782.00 | 446 |
| 5/25/90 | | 678,125.00 | 715,257.66 | 265 |
| 11/26/90 | | 678,125.00 | 689,681.77 | 84 |
| 2/20/91 | | 17,061,551.08 | 17,061,551.08 | 0 |
| 2/20/91 | (3,000.00) | 0.00 | (3,000.00) | 0 |
| 5/27/92 | | 0.00 | 0.00 | -457 |
| 1/25/92 | | 0.00 | 0.00 | -635 |
| 5/27/93 | | 0.00 | 0.00 | -817 |
| 11/26/93 | | 0.00 | 0.00 | -996 |
| | (16,113,817.98) | 23,842,801.08 | 2,079,204.05 | |

Respondent used the same procedure in calculating the excess amount for the
Ironwood bonds.

first computation date according to respondent.  In their briefs, petitioners did not attempt to refute respondent's calculations.

We are convinced that the amounts earned on the GIC's substantially exceeded the amounts which would have been earned if the GIC's had paid a rate equal to the yield of the Bonds. Petitioners do not seriously contend otherwise.  We need not, and do not, decide the exact amount of that excess.  In order to hold that the Bonds should be treated as arbitrage bonds within the meaning of section 148(f), it is sufficient to find, as we do, that the amount earned on the nonpurpose investments (the GIC's) substantially exceeded the amount that would have been earned if the nonpurpose investment had been invested at a rate equal to the yield on the Bond issues, and that the Bond issuer failed to pay the amount of that excess to the United States at the required time.

Petitioners argue that a literal reading of section 148(f) should not apply to the Bonds at issue, because the statute was intended only to recapture the economic benefit received by the issuer.  Petitioners cite Washington v. Commissioner, 692 F.2d 128 (D.C. Cir. 1982), affg. 77 T.C. 656 (1981), for the proposition that a bond issuer must realize an economic benefit in order to trigger the arbitrage provisions.  In State of Washington, this Court concluded that the general arbitrage provisions of section 103(c) were intended to apply only where the issuer of the bond realized an economic benefit.  As a

result, we held that the costs of issuing the bonds, including underwriting costs, should be taken into account in determining the existence of arbitrage.  The Court of Appeals for the District of Columbia Circuit affirmed.

In 1986, when Congress enacted section 148, it specifically reversed Washington v. Commissioner, supra.

>        The bill provides that, under all arbitrage
> restrictions applicable to tax-exempt bonds, the yield
> on an issue is determined based on the issue price,
> taking into account the Code rules on original issue
> discount and discounts on debt instruments issued for
> property (secs. 1273 and 1274).  This amendment
> reverses the holding in the case State of Washington v.
> Commissioner, supra.  [S. Rept. 99-313, at 845 (1986),
> 1986-3 C.B. (Vol. 3) 1, 845.]

The Committee explained the reason for this change as follows:

>        The committee believes it is important for issuers
> of tax-exempt bonds to pay the costs associated with
> their borrowing.  The bill provides that the costs of
> issuance, including attorneys' fees and underwriters'
> commissions, must be paid by the issuers or
> beneficiaries of the bonds, rather than recovered
> through arbitrage profits at the Federal Government's
> expense.  The committee believes that this restriction
> will result in a more efficient use of tax-exempt
> financing, as borrowers will more closely monitor the
> costs of their borrowing.  However, the committee
> intends to monitor the effect of these provisions to
> determine whether further restrictions on costs such as
> attorneys' fees and underwriters' commissions are
> needed.  [S. Rept. 99-313, supra at 828, 1986-3 C.B.
> (Vol. 3) at 828.]

From this, it is clear that when Congress enacted section 148, it did not want to permit the investment of tax-exempt bond proceeds in higher yielding investments, the income from which would be

used to recover costs associated with the bond issue.  In the instant case, that is exactly what happened.  When all the smoke had cleared, the underwriters, bankers, and attorneys had received substantial amounts from the Bonds' proceeds, and the repayment of those Bonds had been secured by the purchase of the GIC's.  The relatively small amount left was insufficient to accomplish the governmental purpose of the bonds.

Petitioners next argue that section 148(f) should not apply when the governmental issuer of the bonds did not intend that the bond proceeds be invested in higher yielding, nonpurpose obligations.  However, the literal provisions of section 148(f)(1) and (2) make no reference to the issuer's intent.  Rather, the language of section 148(f)(2) is computational in nature and unambiguous.[18]

---

[18]There is no need to resort to legislative history, unless the statutory language is ambiguous.  In Hubbard v. United States, 514 U.S. ___, ___, ___, 115 S. Ct. 1754, 1759, 1761 (1995), the Supreme Court recently stated:

> In the ordinary case, absent any "indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it."  BFP v. Resolution Trust Corp., 511 U.S. ___ (1994) (SOUTER, J., dissenting).
>
> * * * * * * *
>
> Courts should not rely on inconclusive statutory history as a basis for refusing to give effect to the plain language of an Act of Congress, particularly when the Legislature has specifically defined the controverted term.  * * *

The statutory context of section 148(f) also supports a literal application of its terms. The general definition of an "arbitrage bond" is contained in section 103(c)(2). An "arbitrage bond", within the meaning of that section, is one that the issuer "reasonably expected" to produce arbitrage. If an issuer "reasonably expected" to earn arbitrage with bond proceeds, the bonds are not tax exempt. Section 148(f) is an additional arbitrage restriction. It was intended to restrict arbitrage even further than the historic reasonable expectation test. In its explanation of the new section 148(f) provisions, the Senate Finance Committee report states:

> The bill generally extends to all tax-exempt bonds (including refunding issues) additional arbitrage restrictions similar to those presently applicable to most IDBs and to qualified mortgage bonds. These restrictions, requiring the rebate of certain arbitrage profits and limiting investment of bond proceeds in nonpurpose obligations, are in addition to the general arbitrage restrictions for all tax-exempt bonds. [S. Rept. 99-313, supra at 845, 1986-3 C.B. (Vol. 3) at 845; emphasis added.]

See also H. Rept. 99-426 (1985), 1986-3 C.B. (Vol. 2) 1, 555. There is no indication in the statute or legislative history that Congress wanted to limit section 148(f) to situations where the issuer intended, or reasonably expected, to earn arbitrage.

Were we to superimpose an intent requirement onto section 148(f), that section would become redundant. Section 103(c) already defined arbitrage bonds as those whose proceeds the issuer reasonably expected, at the time of issue, would be used

to produce arbitrage. For bonds issued after August 15, 1986, the general definition of an arbitrage bond appears in section 148(a). Section 148(a) expanded the definition to include not only bonds that the issuer reasonably expected, at the time of issuance, would produce arbitrage, but also bonds whose proceeds were at any time "intentionally" used by the issuer to acquire higher yielding investments. Arbitrage bonds within the definition of section 103(c) and section 148(a) are not tax exempt, and there are no statutory provisions allowing the issuer to attain or regain tax exempt status by paying the amount of arbitrage earnings to the Federal Government. In contrast, a bond's treatment as an arbitrage bond under section 148(f) depends first upon whether a payment to the United States is required by section 148(f). This cannot be ascertained until after the date the State or local government bonds are issued and after the nonpurpose investment is made. The first computation date for making this determination is normally 5 years after the original bond issue. Furthermore, section 148(f)(1) and (2) does not treat a bond as an arbitrage bond merely because of the existence of excess earnings within the meaning of section 148(f)(2). Rather, it is the existence of such excess (based on a mathematical calculation) plus the failure of the issuer to pay the excess amount to the Federal Government that triggers arbitrage bond treatment and the resulting loss of tax-exempt status.

The regulations under section 148(f) are consistent with the statute and legislative history in that they are mechanical in nature and require no reference to the issuer's intent or expectations. The section 148(f)(2) amount is defined as the excess of the future value of all nonpurpose receipts over the future value of all nonpurpose payments. Sec. 1.148-2(a), Income Tax Regs. "Receipts" are defined broadly to include any amount actually or constructively received with respect to the investment as well as the fair market value of the investment at the end of a computation period. Sec. 1.148-2(b)(2)(i), (iii), Income Tax Regs. "Payments" are also defined broadly and include the amount of gross proceeds of the issue to which the investment is allocated, whether or not the investment was directly purchased with such gross proceeds. Sec. 1.148-2(b)(3)(i) and (ii), Income Tax Regs. If the receipts exceed the payments, there is an amount that must be paid to the United States in order to avoid treatment as an arbitrage bond.

It is clear that the investments in the GIC's earned a higher rate of return than the yield on the Bonds. This produced an excess amount within the meaning of section 148(f)(2). It is also clear that some of the excess was used for purposes that Congress did not want to subsidize through Federal tax exemptions. Congress provided that the exempt status of such bonds could be maintained only if the issuer paid the excess amount as defined in section 148(f)(2) to the United States.

Here, the issuer has thus far refused to pay that amount. Accordingly, we hold that the Whitewater and the Ironwood bonds are to be treated as arbitrage bonds pursuant to section 148(f) and that the interest earned thereon is includable in petitioners' income.[19]

Because we have determined that the Bonds are to be treated as arbitrage bonds under section 148(f), we must address some of the other arguments advanced by petitioners. Petitioners contend that respondent lacks the authority to tax the bondholders, and that her sole remedy is to disqualify the issuer from certifying the nonarbitrage status of its tax-exempt bonds in the future under section 1.103-13(a)(2)(iv), Income Tax Regs. The regulation cited by petitioners neither states nor implies such a proposition. Petitioners have cited no authority to show why the decertification remedy is inconsistent with the Commissioner's concurrent duty to collect income taxes on interest from bonds that are not exempt from tax under section 103. See secs. 6212, 7601. It is not uncommon for the Commissioner to have a variety of ways to carry out her duties. See, e.g., Pesch v. Commissioner, 78 T.C. 100, 117-118 (1982).

---

[19]The parties addressed the following additional issues on brief: (1) Whether the Bonds are arbitrage bonds within the meaning of sec. 103(c)(2); (2) whether the Bonds are taxable industrial development bonds within the meaning of sec. 103(b); and (3) with respect to one of the involved bond issues, whether the public approval requirement set forth in sec. 103(k) was satisfied. However, because we hold that the Bonds are to be treated as arbitrage bonds under sec. 148(f), we need not decide these issues.

Petitioners also argue that respondent has impermissibly discriminated against them by taxing them on the Bond proceeds while, in other cases, respondent has settled with the issuers.[20] This argument is wide of the mark. It is the responsibility of this Court to apply the law to the facts before it and to determine the tax liability of petitioners before it. The Commissioner's treatment of other taxpayers has generally been considered irrelevant in making that determination. Jaggard v. Commissioner, 76 T.C. 222, 226 (1981) (citing Teichgraeber v. Commissioner, 64 T.C. 453, 456 (1975)). To establish illegal discrimination by the Commissioner, petitioners must show more than the fact that they have been treated less favorably than other similarly situated taxpayers. Petitioners must also show that such allegedly discriminatory treatment is based upon impermissible considerations such as race, religion, or the desire to prevent the exercise of constitutional rights. Penn-Field Indus., Inc. v. Commissioner, 74 T.C. 720, 723 (1980).

Petitioners have not shown, in the first instance, that other similarly situated taxpayers received better treatment. In addition, petitioners have not demonstrated that respondent has used impermissible criteria in determining the deficiencies in

---

[20]Any "settlements" with bond issuers may well have included the issuers' payment of an amount pursuant to sec. 148(f)(2). The Housing Authority of Riverside County has made no such payment.

issue.  Petitioners may be, as they allege, the first bondholders to be taxed upon interest received from purportedly tax-exempt bonds that fail to meet the requirements for tax exemption.  However, that does not mean that they have been targets of impermissible discrimination.[21]

Finally, we realize that under our holding, it is the bondholders, rather than the bond issuer, that bear the immediate brunt of the issuer's failure to pay the amount required by section 148(f)(2).  However, the statutory exemption from Federal tax for interest on State and local government bonds is conditioned on the requirement that the bond issuer pay the amount required by section 148(f)(2), and exclusions from taxable income are to be narrowly construed.  Commissioner v. Schleier,

---

[21]Petitioners rely on International Business Machines Corp. v. United States, 170 Ct. Cl. 357, 343 F.2d 914 (1965), to support their claim of discrimination.  In that case, one of IBM's competitors had obtained a ruling from the Commissioner that certain equipment was exempt from an excise tax.  IBM sought a similar ruling for similar equipment, which the Commissioner finally denied 2 years later.  At the time of the denial, the Commissioner prospectively revoked the favorable ruling that IBM's competitor had received, but the competitor had already enjoyed several years of favorable tax treatment.  The Court of Claims found that this course of conduct constituted "manifest and unjustifiable discrimination", and its effect "was to favor the other competitor so sharply that fairness called upon the Commissioner, if he could under Section 7805(b), to establish a greater measure of equality."  343 F.2d at 923.

We find that the present case is distinguishable from IBM.  The present case does not involve a determination by the Commissioner, which has the effect of penalizing petitioners and favoring similarly situated taxpayers so as to give them a significant competitive or financial advantage.

515 U.S. ___, ___, 115 S. Ct. 2159, 2163 (1995).  The simple fact is that the statutory requirements for exempting the interest earned on the Bonds have not been met.  As with other debtor-creditor relationships, the risk that the issuer of bonds will not live up to the responsibilities undertaken when it represented the quality of its obligations must be born by the bond purchasers.

One might also sympathize with the situation of the Housing Authority of Riverside County.  However, it seems clear that, as between it and the Federal Government, the Housing Authority should bear responsibility for what happened.  The Housing Authority issued the Bonds and selected those who were responsible for implementing their issuance and applying the proceeds.  Congress clearly wanted bond issuers to be responsible for meeting the requirements for tax exemption.  The Housing Authority certified that the Bonds would qualify for tax exemption.  Like any other local government bond issuer, the Housing Authority was responsible for paying any amount required by section 148(f)(2), regardless of whether it intended to generate the excess described in section 148(f)(2).  It has thus far chosen not to do so.  Unfortunately for its bondholders, the

statutorily required result of this choice is that the interest on the Bonds is not exempt from Federal taxation.

<u>Decisions will be entered</u>

<u>for respondent</u>.

Reviewed by the Court.

HAMBLEN, CHABOT, GERBER, WRIGHT, PARR, WELLS, WHALEN, COLVIN, BEGHE, CHIECHI, LARO, FOLEY, and VASQUEZ, <u>JJ</u>., agree with this majority opinion.

SWIFT, <u>J</u>., concurs in the result only.

HALPERN, J., concurring: I agree with the majority's opinion except in one respect, the majority's reliance on tracing the bond proceeds into the GIC's. I am not convinced that the statute (sec. 148(f)) contemplates tracing, and I would rely on a different rationale, viz, that the issuer (the Housing Authority) itself invested in the GIC's.

The key to the majority's analysis concerning section 148(f) is in the following paragraph:

> The Whitewater and Ironwood GIC's were acquired with the gross proceeds of the Whitewater and Ironwood bond issues, respectively. These proceeds were first placed in developer loan fund accounts and then transferred to Unified. Unified then transferred most of these proceeds to the MCFC entities, which, in turn, used them to purchase the GIC's. Following the flow of funds on February 20, 1986, it is clear that $16,110,817.98 of Whitewater bond proceeds and $11,047,408.05 of Ironwood bond proceeds were expended to acquire the GIC's. The governmental purpose for the issuance of the Whitewater and Ironwood bonds was the construction of low- and moderate-income multifamily housing projects. The GIC's were not acquired to carry out this governmental purpose. Accordingly, the GIC's constituted nonpurpose investments within the meaning of section 148(f)(6)(A). [Majority op. p. 28.]

Petitioners attempt to rebut the majority's conclusion about the GIC's by (1) conceding that, yes, the bond proceeds are traceable into the GIC's, but (2) arguing that the GIC's were an unauthorized investment. In effect, petitioners' argument is that, whatever in fact happened to the bond proceeds, the Housing Authority did not do it: Some other guys (thieves!) did it. Id. p. 28. The majority makes plain that, to the majority, it does

not matter who invested the bond proceeds in the GIC's, so long as someone (anyone) invested the bond proceeds in the GIC's:

> While the Housing Authority did not directly purchase the GIC's and, presumably, did not intend that the Bond proceeds be used to purchase the GIC's, the GIC's were in fact purchased with the proceeds of the Bonds and committed to provide funds for the repayment of principal and interest on the Bonds rather than for the governmental purpose of constructing multifamily housing. Thus, the GIC's fall within the statutory definition of nonpurpose investments. [Id. at 29-30.]

Section 148(f)(6)(A) defines the term "nonpurpose investment". The operative provision, however, is section 148(f)(2)(A), which provides that the rebatable excess of an arbitrage bond is determined by starting with "the amount earned on all nonpurpose investments". An important question, of course, is: investment by whom? The majority's analysis implicitly leads to the conclusion that, if A lends bond proceeds to B, who lends them to C, who makes an investment of the bond proceeds that, in A's hands, would be a nonpurpose investment, the bonds issued by A can be arbitrage bonds under section 148(f). A's balance sheet, however, shows only B's obligation, and the only investment made by A is in a loan to B. The majority's analysis, in effect, attributes C's use of the bond proceeds to A. Generally, unless there is some special arrangement between the parties to a loan, we would not attribute the actions of the borrower to the lender. If A lends money to B, who, without any instruction from A, buys drugs with the money, we do not attribute the drugs to A. A pertinent

regulation is section 1.103-13(f)(1), Income Tax Regs.,[22] which provides:

> In general.  A State or local governmental unit shall allocate the cost of its acquired obligations to the unspent proceeds of each issue of governmental obligations issued by such unit. * * *  [Emphasis added.]

The majority fails to state who it thinks is making the nonpurpose investments in the GIC's.  If it is any person other than the Housing Authority, then the majority fails adequately to emphasize and justify its tracing rationale.

I would not attempt to justify a tracing rationale.  I think that, on the facts of this case, we can find that the Housing Authority made nonpurpose investments.  I would do so as follows.

The financing plan was that the Housing Authority would lend the bond proceeds to the developers and, in consideration thereof, receive the developer notes and the benefit of the letters of credit.  The letters of credit were to be secured by the GIC's.  Indeed, the expectation was that the letters of credit would be the exclusive source of repayment to the Housing Authority (and on the Bonds).  The first paragraph of the first page of the Secondary Offering Statement of the Ironwood Bond issue states in part:

---

[22]    The parties agree that sec. 1.103-13(f), Income Tax Regs. (1979), is the appropriate regulation governing the allocation of investments to bond proceeds in the case of the bonds in issue.

> The Bonds are secured by, and are paid solely from, a
> direct pay Letter of Credit issued by Mercantile
> Capital Finance Corporation No. 30 (the "Credit
> Institution") to secure and provide the source of
> repayment of the principal of, and interest on, a loan
> to be made to the Developer to finance the Development
> (as hereinafter defined) with respect to which the
> Bonds are issued.  The sole source of payment of the
> Letter of Credit is a guaranteed investment contract
> . . . described herein, the payments on which are to be
> made to the First National Bank of Commerce, New
> Orleans, Louisiana, as collateral agent (the Collateral
> Agent").

The Secondary Offering Statement for the Whitewater bonds is identical except that Mercantile Capital Finance Corporation (MCFC) No. 47 is substituted for MCFC No. 30.  The letters of credit (secured by the guaranteed investment contracts) were, thus, in substance, if not in form, investment property held by the Housing Authority.  I say that for the following reasons: The letters of credit were to be the source of funds to discharge the Housing Authority's nominal obligation to repay the bonds. The developer notes were of no economic consequence to the Housing Authority (or to the bondholders).  Neither the Housing Authority nor the bondholders necessarily cared whether the developer notes were paid.  Indeed, it is difficult to see how, if the deal had gone as planned, the developers could have paid off both the developer notes and the reimbursement notes (issued to pay for the letters of credit).  Based on that rationale, I would say that the letters of credit _were_ acquired by the Housing Authority and were _not_ acquired in order to carry out the governmental purpose of the issue.  Accordingly, the letters of

credit constitute nonpurpose investments within the meaning of section 148(f)(6)(A).

My analysis does not turn on the diversion of the bond proceeds from the contemplated purposes of the bond issues. Thus, it should answer the criticism of Judge Jacobs as to the reasonable expectations of the Housing Authority officials on February 20, 1986, the date on which the majority finds (and Judge Jacobs agrees) the bonds were issued.  As of that date, apparently, the "black [boxes]" referred to by Judge Jacobs (Jacobs, J., dissenting op. note 4) had been designed, as integral parts of the bond financings, and were known to (or should have been known to) the Housing Authority.

BEGHE, <u>J</u>., concurring:  I agree with and have joined the majority opinion that the bonds in question were taxable arbitrage bonds within the meaning of section 148(f):  the bond proceeds were used to purchase investments that were not acquired to carry out the governmental purpose; those investments produced excess earnings under section 148(f)(2); and the issuer has failed to rebate the amount of the excess earnings to the United States.  In enacting section 148(f) of the 1986 Code, Congress repudiated the holding of <u>Washington v. Commissioner</u>, 77 T.C. 656 (1981), affd. 692 F.2d 128 (D.C. Cir. 1982), and thereby made clear that "amounts earned" on nonpurpose investments are not limited to amounts that directly inure to the issuer:  they also include excess earnings that enable more than a de minimis part of the bond proceeds to be diverted to pay underwriters, bond and tax counsel, and other service providers.  See S. Rept. 99-313, at 828, 845 (1985), 1986-3 C.B. (Vol. 3) 1, 828, 845.  As a result, the interest on the bonds ostensibly issued by the Riverside Housing Authority was not excludable from the income of the bondholders under section 103.

I write separately to focus on three additional grounds, the first two of which were also advanced by respondent, for holding taxable the bonds in this case (and the bonds in other pending cases).

I.

I believe that the bonds in question were arbitrage bonds on the date of issuance under section 103(d), as enacted by the Tax Reform Act of 1969, Pub. L. 91-172, sec. 601(a), 83 Stat. 487, 656. Contrary to Judge Jacobs, dissenting op. p. 65, I believe that the Riverside Housing Authority failed to show, as of the date of issuance in February 1986, that it did not reasonably expect that the proceeds would be invested in higher yield obligations.

On the subject of reasonable expectations, petitioners are off base in arguing that, if our decision goes against them, the standard of care required of state and local issuers will have been retroactively made higher than it was or should have been at the time the deals were done. I agree with respondent that the issuer's standard of care set forth in section 1.148-1(b), Income Tax Regs. (the 1993 reg.), is basically no different from what was required under the regulation in effect in 1985-86, section 1.103-13(a)(2), Income Tax Regs. (the 1979 reg.). Even if there may now be a higher level of consciousness among state and local bond issuers and their counsel about the levels of due diligence required, reasonableness is an objective and normative standard. By any such standard, the Riverside Housing Authority and its counsel were egregiously and inexcusably lax in failing to

monitor the Whitewater and Ironwood transactions and in allowing the messes to happen.[1]

## II.

In addition to being arbitrage bonds, the bonds were also taxable industrial development bonds under section 103(b)(1) of the 1954 Code.

Petitioners have conceded that the Whitewater and Ironwood bonds were industrial development bonds within the meaning of

---

[1]    What I have in mind here was said by Judge Learned Hand in the landmark tort case in which he made it clear that a normative standard of care and reasonableness--that courts are authorized to determine and impose--trumps the customary practices of a particular industry:

Is it then a final answer that the business had not yet generally adopted receiving sets?  There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves.  Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and  available devices.  It never may set its own tests, however persuasive be its usages.  Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.  But here there was no custom at all as to receiving sets; some had them, some did not; the most that can be argued is that they had not yet become general.  Certainly in such a case we need not pause; when some have thought a device necessary, at least we may say that they were right, and the others too slack.  The statute does not bear on this situation at all.  It prescribes not a receiving, but a transmitting set, and for a very different purpose; to call for help, not to get news. We hold the tugs therefore because had they been properly equipped, they would have got the Arlington reports.  The injury was a direct consequence of this unseaworthiness.  [The T.J. Hooper v. Northern Barge Corp., 60 F.2d 737, 739 (2d Cir. 1932); citations omitted.]

section 103(b)(2) of the 1954 Code, on the ground that the proceeds of both issues were "to be used directly . . . in any trade or business carried on by any person who is not an exempt person."  The only dispute on this issue is whether the bonds qualified under section 103(b)(4)(A), which provides that an industrial development bond will not be taxable under section 103(b)(1) if it is part of an issue "substantially all of the proceeds of which are to be used to provide" (emphasis added) various exempt facilities.  The question is the meaning of the phrase "are to be used".

Both the Whitewater and the Ironwood issues were industrial development bonds under section 103(b)(2) because the proceeds were to be lent to private, for-profit developers for the purpose of constructing apartment projects to be used in a private trade or business, and repayment of the bonds was to be secured, directly or indirectly, by the apartment projects and the income they produced.  Although the documents provided that the Whitewater bonds and the Ironwood bonds were to fund the construction of residential rental properties that would meet the 20 percent low-income set-aside requirements of section 103(b)(4)(A)(ii),[2] what is in dispute is whether substantially

---

[2]Respondent concedes that the Ironwood project met the low-income set-aside requirements of sec. 103(b)(4)(A)(ii).

all the proceeds of the Whitewater and Ironwood bonds were to be used for residential rental property.

While the phrase in section 103(b)(4) is "are to be used," the statutory sentence does not stop there but sets forth low-income residence requirements that must be met "at all times during the qualified project period".  Thus, compliance requires examination of actual events occurring after the issue date.  It would be illogical to suggest that expectations controlled until the units were occupied, and that thereafter actual events would control.  Such a reading would put a party that never tried to build the residential rental project in a better position than a party who built the project but inadvertently failed to satisfy the low-income requirements.  Under section 1.103-8(b)(6)(ii) and (iii), Income Tax Regs. (the 1979 reg.), issuers are permitted a reasonable period of time to correct noncompliance.

Section 1.103-8(b)(6)(i) and (9), Income Tax Regs. (the 1979 reg.), makes clear that satisfaction of the residential rental property exception of section 103(b)(4)(A) requires more than just a good faith hope or assumption that the proceeds of a bond issue will be properly applied.  Section 1.103-8(b)(6)(i), Income Tax Regs. (the 1979 reg.), provides that a post-issuance nonconforming change will vitiate the exemption--retroactive to the original issue date--unless corrected within a reasonable time.  Examples (4) and (5) of section 1.103-8(b)(9), Income Tax Regs. (the 1979 reg.), illustrate this rule.

In example (5), 5 years after constructing a qualified residential rental project, Corporation P, the developer and owner, converted 80 percent of the units into nonqualifying condominium units and repaid the loan to State X, the bond issuer, which in turn redeemed the bonds.  The example concludes that the bonds were not used to provide residential rental housing within the meaning of section 103(b)(4)(A).

In example (4), there is a similar disqualifying event, the failure of the issuer, County Z, to enforce the 20 percent requirement.  As a result, the bonds are classified as nonexempt industrial development bonds, retroactive to the date of issuance.[3]

Petitioners would construe examples (4) and (5) as inapplicable because the disqualifying actions by the issuers or developers are "volitional".  I believe that the examples do apply to the case at hand because in each of them--as in the case at hand--the governmental issuer fails to enforce the statutory

---

[3]See also sec. 1.103-8(a)(1), Income Tax Regs. (the 1979 reg.). ("Substantially all of the proceeds of an issue of governmental obligations are used to provide an exempt facility if 90% or more of such proceeds are so used."); H. Conf. Rept. 99-841, at II-697 (1986), 1986-3 C.B. (Vol. 4) 1, 697 ("The conference agreement further provides that at least 95 percent of the net proceeds of each issue must be used for the exempt facility for which the bonds are issued"); Woods v. Homes & Structures, Inc., 489 F. Supp. 1270, 1292 (D. Kan. 1980) ("Although section 103, speaks in prospective terms * * * we tend to agree with plaintiffs that the actual distribution of the proceeds will control.").

requirements that are violated by the developer-owner of the project.

The Whitewater project was never built; no units were ever built for rental to low- and moderate-income tenants or to anyone else. Indeed, the Whitewater project could never have been built with bond proceeds because, on February 20, 1986, $16,110,817.98 (91 percent) of the $17,778,146.53 of the Whitewater bond proceeds was invested in a GIC that had the same maturity as the bonds.

The appropriate test is whether the issuer reasonably expects, at the time the bonds are issued, that substantially all of the bond proceeds will be devoted to the exempt facility and the issuer thereafter takes steps to ensure that the bond proceeds are used in a manner consistent with those expectations. In addition, in conduit financing transactions such as Whitewater and Ironwood, the expectations and subsequent conduct of the conduit borrowers, the Whitewater and Ironwood partnerships, must also be considered. Industrial development bond financing by definition contemplates significant involvement by nongovernmental parties. Interest on industrial development bonds is exempt from taxation only if the exempt facility rules are met. Because the exempt facility rules require proceeds to be spent in a specified manner and because a conduit borrower is a necessary party to an exempt facility financing, testing compliance with the exempt facility rules in the use at hand

requires consideration of the actions of the conduit borrowers, the Whitewater and Ironwood partnerships.

Construing section 103(b)(4) to require subsequent conduct in furtherance of the original reasonable expectations is consistent with the statutory language and furthers the statutory purpose.  Section 103(b)(4) contains set-aside requirements that must be met throughout the "qualified project period" (a period that begins on the first day in which 10 percent of the project units are occupied).  If those set-aside requirements are not met, the interest on the bonds is taxable from the date of issuance, irrespective of the reasonableness of the issuer's expectations at the inception of the deal.  Sec. 103(b)(4)(A), (12)(B).  Thus, the phrase "are to be used" looks to how the bond proceeds are actually used, not just to how the proceeds were expected to be used at the time the bonds were issued.

This conclusion is supported by the contrasting language of subsections (c) and (b) of section 103.  Section 103(c) defines an "arbitrage bond" as a bond "the proceeds of which are reasonably expected to be used" (emphasis added) for higher yielding investments.  Compare the clear command of section 103(c) to look only at expectations with the language of section 103(b), which provides how substantially all of the "proceeds of * * * [the bond issue] are to be used."  (Emphasis added.)  This difference in focus strongly suggests that Congress intended two

- 59 -

different tests to apply and that the test in section 103(b) was intended to be more than a pure expectations test.

This suggested reading of this statutory provision also prevents bizarre and inappropriate results. If only expectations on the date of issue are relevant, then an issuer who initially planned to have residential rental property built, but never took steps to assure that the housing project was constructed, would be better off under the statute than an issuer who actually caused the housing to be constructed but then inadvertently failed to satisfy the set-aside requirements. Such an anomalous result would be the product of petitioners' interpretation of the statute. Thus, substantially all of the Whitewater bond proceeds were not "to be used" for residential rental property within the meaning of section 103(b)(4).

While respondent concedes that the Ironwood project was built and provided housing for low- and moderate-income tenants, the Ironwood bonds are nevertheless not entitled to tax-exempt status under section 103(b)(4). Just like the Whitewater bonds, substantially all of the bond proceeds ($11,047,408.05 of the $12,190,843.34 or 91 percent of the proceeds) went directly into a higher yielding GIC that had the same maturity as the bonds. Because the bond proceeds were tied up in the GIC, another source of funds had to be found to pay for the project. That source turned out to be Far West Savings and Loan, which made a conventional secured construction loan of $10,300,000 to Ironwood

Apartments Ltd. evidenced by a disbursement agreement, promissory note, deed of trust, and other related loan documents.

Except for the relatively modest amount spent to purchase the Ironwood land, the Ironwood project was financed by a conventional mortgage loan from a conventional savings and loan, not with bond proceeds.  Given the structure of the deal, it could not have been otherwise.  The lion's share of the Ironwood bond proceeds had already been invested in the Ironwood GIC. From February 20, 1986, until December 1, 1993, when the GIC paid off and the bonds were redeemed, that is where they stayed.

The Riverside Housing Authority could not have reasonably expected that substantially all of the proceeds of the Whitewater and Ironwood bonds would be used to construct the projects.  This is because the bond financing documents deprived it, the Trustee, and the conduit borrowers (the developers) of control over the bond proceeds and allowed the bond proceeds to be diverted. Without any agreement, the Riverside Housing Authority, the Trustee, and the conduit borrowers had no assurance that the bond proceeds would be used, as required by the bond indentures, to finance the multifamily housing projects.

Petitioners have argued that the Riverside Housing Authority was duped, indeed that the bond proceeds were stolen, and Judge Jacobs seems to agree.  It was not, however, reasonable for the Riverside Housing Authority to sponsor a financing structure that permitted it, the Trustee, and the developer to lose control of

the bond proceeds.  Like section 103(c), section 103(b) should not be read to encourage issuers both to be ignorant of the facts prospectively and to remain ignorant and do nothing after the fact.

Because the Whitewater and Ironwood bonds were not exempt industrial development bonds under section 103(b)(4), by virtue of section 103(b)(1), they were not tax-exempt bonds under section 103(a).

Petitioners and Judge Jacobs, dissenting op. note 2, argue that the diversion of the bond proceeds amounted to "involuntary noncompliance" under section 1.103-8(b)(6)(iii), Income Tax Regs. (the 1979 reg.).  Their argument seems to be based on the assumption or assertion that nothing could be done after the fact by the Riverside Housing Authority because the bond proceeds had flowed irrevocably to Crown Life Insurance Co., which had issued the GIC's.  Judge Jacobs states that "the Bond proceeds were improperly locked into GIC's", dissenting op. note 2.  However, I don't understand why the Riverside Housing Authority could not have brought a successful action to revoke the GIC's and recover the proceeds for use as originally intended.  If the funds had been unlawfully diverted, didn't Crown Life Insurance Co. have notice, actual or constructive, of this fact?  The answer to these questions may be that the Riverside Housing Authority decided, once things started to go badly for the developer, that it would be better to leave the bond holders with the continuing

better assurance that they would receive interest and principal payments, as originally scheduled, through the security of the GIC's. Even if such had been the case, the security so created must be at the price of the loss of the tax exemption for the interest on the bonds.

## III.

Although I accept the stipulations of the parties and the findings of the trier of fact, as adopted by the majority in the case at hand, I'm impelled to raise a question that may be germane to other pending cases. If the failures in other cases of the purported government issuers to supervise the receipt and disposition of bond proceeds were as egregious as they were in the case at hand, the question that may arise in such other cases is whether the bonds were ever issued or validly issued by the local governments or authorities.

In the case at hand, it might well have been concluded that the Riverside Housing Authority was so out of the loop that, under step transaction principles, the bond holders were the recipients of nothing more than the obligations of Crown Life Insurance Co. or of undivided interests in the GIC's--taxable obligations of a private issuer--that were purchased with the bond proceeds for their benefit. The Housing Authority was so lax in failing to see to it that the proceeds were used for the intended purpose as to raise the question whether the Housing Authority actually had any such purpose, thereby calling into

question the validity of its purported issuance of bonds. As the

Court of Appeals for the District of Columbia Circuit said in

Washington v. Commissioner, 692 F.2d at 137:

> Still, states and municipalities should be chary in their issuance of tax-free bonds and their subsequent reinvestment of the proceeds. It is a fundamental principle of state and municipal bond law that the issuing body must have a legitimate, independent purpose to sell debt instruments in order to raise moneys. L. Jones, THE LAW OF BONDS AND BOND SECURITIES §12 (1950). If no such purpose exists, the issuance would be violative of local law, and should not qualify for the tax exemption that Section 103 provides for validly issued municipal and state bonds. * * *

The steps in the analysis would be along the following

lines:

1. The bonds were sold to the public as the Housing

Authority's revenue bonds, based on representations that the

proceeds would be used to finance construction of the housing

projects.

2. Because the obligations on the bonds were nonrecourse to

the Housing Authority, the primary sources of payment of the bond

obligations were to be the housing projects and the income

streams that the projects were expected to generate.

3. Contrary to the conception underlying a properly

structured "black box" scheme,[4] the proceeds of the bond

offerings were irrevocably diverted from the projects on the day

---

[4]I have my doubts about the efficaciousness of the "black box" scheme, but, under the facts of the purported bond issues of the Riverside Housing Authority, that question need not detain us in other cases in which the bond proceeds were diverted in similar fashion.

of issuance and what was substituted for the projects as security for the obligations to the investors were shell corporations' letters of credit secured by the GIC's.

4.  What this means is that the so-called originator of the conduit financings, the Housing Authority, was eliminated from (or never even got into) the loop.  The Housing Authority as such did not issue its own bonds.  All that the so-called bonds purportedly issued by the Housing Authority evidenced were the interests of the bond holders in the GIC's, which were obligations of a taxable entity, the Crown Life Insurance Co.  As a result, the bonds were taxable obligations from their inception.

All the woofing about reasonable expectations, monitoring actual usage, the arbitrage rebate rules, and the status of the bonds as industrial development bonds may well be subsequent questions that one need never get to under a proper tax analysis.

CHABOT, J., agrees with this concurring opinion.

JACOBS, J., dissenting: The majority opinion is premised on the notion that section 148(f) is unambiguous, thus preventing us from looking beyond the words of the statute. In my opinion, the majority's mechanical interpretation of section 148(f), when applied to the unusual facts of this case,[1] leads to a result that does not comport with the rationale behind the promulgation of the arbitrage provisions. See Birdwell v. Skeen, 983 F.2d 1332, 1337 (5th Cir. 1993); Wilshire Westwood Associates v. Atlantic Richfield Corp., 881 F.2d 801, 804 (9th Cir. 1989). Accordingly, I believe that we should resort to the legislative history for aid in applying section 148(f) to the facts of this case. By doing so, I conclude, as petitioners do, that Congress did not intend to make the issuers of tax-exempt bonds (here, the Housing Authority of Riverside County, California) the insurers for wrongful actions of those who misuse the bond proceeds to earn arbitrage profits for themselves. Accordingly, I would hold that the Bonds issued by the Housing Authority are not arbitrage bonds. I would further hold that the Bonds are nontaxable industrial development bonds.[2]

---

[1] Statutory text should not be read in an atmosphere of sterility, but rather in the context of the specific facts and circumstances of each case. See 2A Singer, Sutherland Statutory Construction, sec. 45.12, at 61 (5th ed. 1992). "The use of literalism suggests that a judge puts on blinders, so to speak, obscuring from view everything but the text of the statute whose effect on the matter at issue is in question." Id. sec. 46.02, at 92.

[2] Admittedly, the Bonds were industrial development bonds under sec. 103(b)(2). However, the Bonds come within the exception provided by sec. 103(b)(4)(A). That section provides that the interest on the obligations is not taxable as long as

(continued...)

Ultimately, I would hold that the interest on the Bonds is excludable from gross income under section 103(a).

Section 103(a) provides that a taxpayer's gross income does not include interest earned on the obligations of a State or a political subdivision of a State. This exemption has been a feature of the Internal Revenue Code ever since the Federal income tax was adopted in 1913. S. Rept. 91-552, at 219 (1969), 1969-3 C.B. 423, 562. The purpose of this exemption is to assist State and local governments by allowing them to issue marketable bonds at interest rates below those of corporate and Federal securities. See, e.g., State of Washington  v. Commissioner, 77 T.C. 656 (1981), affd. 692 F.2d 128 (D.C. Cir. 1982); 113 Cong. Rec. 31,611 (daily ed. Nov. 8, 1967) (statement of Senator Ribicoff).

---

[2](...continued)
substantially all of the proceeds are to be used to construct residential rental property where 20 percent or more of the units in each project are to be occupied by individuals of low or moderate income. Such obligations are referred to in the body of this dissent as nontaxable industrial development bonds.

Pursuant to sec. 1.103-8(b)(6)(iii), Income Tax Regs., the "substantially all" requirements of sec. 103(b)(4) do not apply to a project in the event of "involuntary noncompliance", provided the obligation used to provide financing for the project is retired within a reasonable period. In my opinion, the Bonds satisfied the "substantially all" requirements of sec. 1.103-8(b)(6)(iii), Income Tax Regs., because the Whitewater and Ironwood projects were not constructed due to "involuntary noncompliance" on the part of the Housing Authority of Riverside County. Further, because the Bond proceeds were improperly locked into GIC's, the term of the GIC's determined when the Bonds could be retired.

Morever, with respect to the Whitewater bonds, I would hold that their issuance satisfied the reasonable public notice requirements of sec. 103(k)(2)(B)(i).

Having been the trial judge,[3] I had the opportunity to observe William Rosenberger (executive director of the Housing Authority and the person charged with responsibility for the issuance of the Bonds) testify. I am convinced that he, as well as the other Housing Authority officials, reasonably expected that the Bond proceeds would be used for the construction of housing for low-to-moderate-income families and that the GIC's would be held by the MCFC companies as unrelated guarantors of the bond payments. I am further convinced that at no relevant time did he or other Housing Authority officials have any reason to suspect that Unified and the MCFC companies would divert the Bond proceeds from the construction of housing to the purchase of GIC's, which in turn would be used to pay the debt service on the Bonds.[4]

---

[3] The majority opinion has adopted my findings of fact. See majority op. p. 4.

[4] In basic bond financing, bond proceeds are disbursed directly to the developer in exchange for the developer's note, which is secured by a lien on the underlying project (including the anticipated revenue stream). In many instances, a credit enhancement instrument, such as a letter of credit, is obtained. The bond issue in this case involved a form of "black box" structure. Theoretically, in such a structure, the bond proceeds are disbursed to the developer pursuant to an unsecured loan agreement with the issuer. The developer then invests the bond proceeds with a financial institution. Simultaneously, the developer procures a letter of credit to secure repayment of the bonds from another institution (the L/C provider) in exchange for a mortgage on the project. The L/C provider simultaneously sells the project mortgage to the financial institution where the bond proceeds are invested. Finally, and also simultaneously with the other transactions, the L/C provider purchases a GIC from an insurance carrier and hypothecates it to secure the interest and principal payments on the bonds. Thus, in theory, the black box structure makes bond proceeds available to a developer for construction on a credit enhanced and rated basis.

(continued...)

The Housing Authority did not benefit from the misuse of the Bond proceeds. The majority, however, would attribute the shenanigans of the wrongdoers to the Housing Authority; I would not.

The development of the arbitrage provisions shows that Congress sought to prevent States and their subdivisions from misusing their tax-exempt privileges by issuing low-yielding bonds and thereafter investing the bond proceeds into higher-yielding instruments. There is no indication that Congress would require States or local governments to rebate amounts that they never authorized or received.

In 1969, when Congress enacted the section 103 provisions removing arbitrage bonds from tax-exempt status, the Senate Finance Committee explained that it did so to ensure that the Federal Government does not become "an unintended source of revenue for State and local governments". S. Rept. 91-522, supra at 219, 1969-3 C.B. at 562. Concerns later developed, however, that unwary purchasers of tax-exempt bonds might be taxed upon the interest

---

⁴(...continued)
     In this case, the black box structure was corrupted by the use of Unified, a shell entity, instead of a bona fide financial institution that was supposed to be both the depository of the bond proceeds and the buyer (from separate funds) of the project mortgage from the L/C provider. Because Unified had no substantial capital of its own, it used the Bond proceeds to buy the project mortgage; and via this route, the Bond proceeds were invested in the GIC's. Unified improperly used the Bond proceeds to purchase the GIC's, causing the Commissioner to assert that the Bonds are to be treated as arbitrage bonds pursuant to the provisions of sec. 148(f). Hence, the central failure in this case was the improper use of the Bond proceeds by Unified to purchase the GIC's.

received if the issuer subsequently used the proceeds for arbitrage revenue. At a congressional hearing in 1978, Assistant Secretary Lubick was asked whether the Commissioner could change his mind about the nonarbitrage status of a bond after it was issued. Mr. Lubick replied: "That is a determination which is made as of the issuance date. The fact that the [issuer] goes on and does something different from what it proposed originally does not change the status of the bond. This determination is made ab initio." Revenue Act of 1978: Hearings on H.R. 13511 before the Senate Comm. on Finance, 95th Cong., 2d Sess. 958-959 (1978).

In 1984, Congress reviewed the various remaining provisions that permitted States to collect arbitrage and noted: "Present rules permit issuers to retain any arbitrage earned under these rules". H. Conf. Rept. 98-861, at 1205 (1984), 1984-3 C.B. (Vol. 2) 1, 459 (emphasis supplied). Congress therefore made the rebate provisions applicable to certain industrial development bonds and to certain student loan bonds. Sec. 103(c)(6), as added by Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 624(a), 98 Stat. 922.

In the Tax Reform Act of 1986, Congress decided to extend the rebate requirements to additional classes of tax-exempt bonds, including those issued to provide multifamily residential housing.[5] See Tax Reform Act of 1986 (TRA), Pub. L. 99-514, sec. 1314(d), 100 Stat. 2664. With this change came new rules relating to the

---

[5] I agree with the majority's conclusion that the date of issuance of the Bonds was not Dec. 31, 1985, but rather Feb. 20, 1986.

computation of the rebate. The amount to be rebated is determined by first finding the amount earned on "nonpurpose investments". These earnings then are compared to the amount that would be yielded at the bond issue's rate of interest. For such purposes, the Commissioner's regulations, in general, require an allocation of the higher-earning nonpurpose "acquired obligations" to bond proceeds under an accounting pooling convention. These regulations, however, continue to reflect that the "acquired obligations" to be scrutinized are those acquired by the State or local government that issues the bonds. Thus, section 1.103-13(f)(1), Income Tax Regs., provides:

> In general. A State or local government unit shall allocate the cost of its acquired obligations to the unspent proceeds of each issue of governmental obligations issued by such unit. * * * [Emphasis added.]

Congress added another important provision in the Tax Reform Act of 1986 when it provided that a bond will be considered an arbitrage bond if, after the bond is issued, the issuer intentionally uses the proceeds to earn arbitrage. Sec. 148(a), as added by TRA sec. 1301(b), 100 Stat. 2641; see H. Conf. Rept. 98-841, at II-746 (1986), 1986-3 C.B. (Vol. 4), 1, 746. By its terms, section 148(a) will remove the tax-exempt status of a bond retroactively, but only when the issuer intentionally contravenes the provisions against arbitrage. This new provision thus provides an exception to the assurances earlier provided by Assistant Secretary Lubick that the tax-exempt status of a bond would be determined as of the date of issue.

The legislative history of the arbitrage and rebate provisions shows a consistent congressional intent that State and local governments (the issuers) not profit from arbitrage. It is plain that, in requiring rebates of excess earnings on "nonpurpose investments", Congress contemplated investments made by the issuers, not unauthorized investments of bond proceeds diverted to improper uses by others. As petitioners state in their brief: "Nothing * * * suggests that money once stolen is subject to the yield restriction rules".

When Congress enacted section 148(f), it did not intend to require the rebate of arbitrage created by the unauthorized acts of persons other than the issuer and not received by the issuer. Such amounts are not amounts earned on nonpurpose investments within the meaning of that provision. My conclusion is reinforced by Congress' contemporaneous inclusion of section 148(a) in the Tax Reform Act of 1986. As a result of the enactment of section 148(a), Congress expanded the definition of arbitrage bonds to include those that involved the issuer's <u>intentional</u> acquisition of post-issuance arbitrage earnings. Congress thus put the tax exemption for interest earned on bonds at risk where a State or its subdivision intentionally used the bond proceeds to earn arbitrage profits. In such a circumstance, a violation of section 148(a) cannot be cured. However, by enacting section 148(f), Congress permitted the use of the rebate provisions to preserve the bonds' exempt status in situations where the issuer unintentionally made

a post-issuance, nonpurpose investment that yielded earnings in excess of the bond earnings.

Section 148(f) by its terms applies only to amounts earned on nonpurpose investments. Nothing in section 148(f) indicates that it should apply to an issuer that did not make any nonpurpose investment.